HAMMOND (SAXE v.). See Case No. 12,411.

HAMMOND (SMITH v.). See Case No. 13,-053.

HAMMOND (THORP v.). See Case No. 14,-004.

HAMMOND (UNITED STATES v.). See Cases Nos. 15,292–15,294.

## Case No. 6,005.

### The HAMMONIA.

[4 Ben. 515.] [1]

District Court, S. D. New York. Feb., 1871. [2]

COLLISION OFF NANTUCKET—STEAMER AND BARK—FOG—IGNORANTLY CHANGING COURSE—EVIDENCE.

1. A steamer and a bark came in collision off Nantucket Shoals in the day time, in a fog. There was a dispute as to the wind, the steamer claiming that it was south southwest, and free for the bark, which was sailing east half north, while the bark claimed that it was south southeast, and that she was close-hauled. The steamer's whistle was heard on the bark, off her weather bow, and, at the second whistle, the course of the bark was changed to port about half a point, to give her a good full. The fog-horn of the bark, which was properly blown, was heard ahead of the steamer, which was heading west half south. The steamer ported her helm, so that, at the collision, she was heading north northwest, and she struck the bark on the starboard side, stem on, at nearly right angles: *Held*, that the bark was not in fault.

2. The steamer was in fault in porting, in ignorance of the bark's position and course, which, though parallel, was not end on to her own. She should have stopped and reversed, without changing her helm. She could only infer, from hearing the fog-horn, that it came from a sailing vessel under way, and she was, therefore, chargeable with knowledge that, if there was any risk of collision, it was her duty

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 6,007.]

to keep out of the way, and also her duty to slacken her speed, and, if necessary, to stop and reverse, and the duty of the sailing vessel to keep her course.

[Cited in The City of New York, 35 Fed. 609.]

[See The Aleppo, Case No. 157.]

3. The testimony of the witnesses from the bark, as to the wind, was more reliable than that of the witnesses from the steamer.

In admiralty.

Vose & McDaniel and Everett P. Wheeler, for libellants.

William C. Barrett and Charles Donohue, for claimants.

BLATCHFORD, District Judge. On the afternoon of the 28th of June, 1869, about three o'clock, in a dense fog, off Nantucket Shoals, the bark Harriet Lievesley, a vessel of 365 tons burthen, owned by the libellants, and on a voyage from New York to Pictou, Nova Scotia, was run into by the iron screw steamer Hammonia, a vessel of 3,000 tons burthen, bound from Havre to New York. The stem of the steamer struck the starboard side of the bark about amidships, and penetrated into the bark several feet, crushing in her starboard side and throwing her on her beam ends on her port side, with her sails and masts lying flat on the water. She was abandoned, her crew, with the exception of one man, who was drowned, having been taken off by the Hammonia, and carried to New York. She was subsequently raised by wreckers.

The libel alleges, that the bark had her fog-horn constantly blowing; that, about ten minutes past three o'clock, p. m., she was steering east half north, the wind being south southeast, the fog very dense and the fog-horn blowing, when the whistle of a steamer was heard about two or three points on the weather bow, which afterwards proved to be from the Hammonia; that the fog-horn was kept constantly blowing on board of the bark, and was plainly heard by those in charge of the steamer; that, in one or two minutes after hearing the first whistle, a second whistle was heard, then about four points on the weather bow; that, almost immediately afterwards, the steamer was close upon the bark, proceeding almost directly across the track of the bark; that the collision then ensued; that the bark had a competent lookout, who was on his post and attending to his duties; that the steamer, at the time the fog-horn of the bark was first heard by those in charge of the steamer, was proceeding at a high rate of speed, much faster than was safe or prudent during so dense a fog; that, notwithstanding the fog, if the steamer had kept the course upon which she was at the time, she might have avoided the collision; that, even in the fog, the collision would not have occurred if the steamer had been going at a reasonable rate; and that the collision would not have occurred if the steamer had

done anything to avoid it, or anything except what she did do. The libellants claim to recover against the steamer the damages sustained by them by the collision.

The answer avers, that, about noon on the day of the collision, a dense fog set in; that the speed of the steamer was then slackened, and six men were put on the watch and lookout, and the master, the second officer, and a New York pilot, who had been taken on board that day, took positions on the bridge, and another officer was placed on the quarter deck, and four men were kept at the wheel; that, owing to the fog, every possible precaution was adopted and used which long nautical experience could suggest; that, at three o'clock, p. m., the sound of a fog-horn was heard directly ahead of the steamer; that, immediately on hearing the fog-horn, the helm of the steamer was put hard-a-port, and her engines were stopped and then reversed at full speed; that, notwithstanding such precaution, the stem of the steamer struck in the middle of the starboard side of the bark; that, prior to and at the time of the collision, the wind was from south to south southwest, and free for the bark, and the bark starboarded her helm; that, during the continuance of the fog, and long prior to, and up to the moment of, the collision, the whistle of the steamer was blown every thirty seconds, and those in charge of her used the greatest care and skill in managing her, and took every possible precaution to prevent the occurrence of any accident; and that the collision was occasioned by the gross negligence and want of care and skill of those on board of the bark, in not keeping a good lookout, in not blowing the horn and in starboarding her helm.

The theory of the claimants as to how the collision occurred is, that the vessels were meeting directly end on, that the steamer ported and the bark starboarded, and that thus they came in contact. It is shown, that, before the steamer heard the bark's fog-horn, the course of the steamer was west half south, and that, before the bark heard the steamer's whistle, the course of the bark was east half north. These courses, though in direct antagonism to each other, do not necessarily indicate a meeting end on. They may as well indicate parallelism of courses. It is admitted by the steamer, that she changed her course by porting before she struck the bark, to such an extent, that, when she struck the bark, she was heading north northwest—a change of six points and a half. The pilot makes it this, though other testimony is to a change of only six points. I am entirely satisfied, from the evidence, that the blow was given as the steamer headed nearly at right angles to the course of the bark. An east northeast course is a course at right angles to a north northwest course. If the bark was heading east northeast when struck, she was only a point and a half off from her east half north

course. The testimony on the part of the bark is, that the wind was from south by east to south southeast, or, as the man at her wheel says, south by east half east. If so, and her course was east half north, she was sailing within seven points of the wind and was close-hauled on her starboard tack. Nicholson, the man at her wheel, says he was steering full and by all the time. The testimony of the witnesses on the bark, which was using her sails, and going three or four knots an hour, is more reliable as to the direction of the wind, than that of the witnesses on the steamer, which was not using any sails, and was going from eight to nine knots an hour. The testimony on the part of the steamer makes the wind south, southwest, or three points and a half more free for the bark. The testimony on the part of the bark is, that the first whistle from the steamer was heard on the bark by Nicholson, and by the master, and by the cook, from three to three and a half points on the starboard or weather bow of the bark; that the master immediately said that there was the whistle of a steamer; that, almost at the same time, a report came from the lookout on the bow, a Norwegian, that there was a whistle on the weather bow; that the fog-horn had been, up to that time, being constantly blown by such lookout; that the master, on hearing the whistle, told the lookout to blow the horn freely, which was done all the time; that then a second whistle was heard further on the starboard bow, and from five and a half or six points on that bow; that, when the second whistle was heard, the master said to Nicholson that it was from a steamer going to the westward, and that they were clear of her, and asked Nicholson how the bark was heading, and Nicholson replied, east half north, and the master told Nicholson to keep the bark a good full, and Nicholson kept her off half a point; that then a third whistle was heard from the steamer, about abeam of the bark, and the master said that the steamer had ported her helm and was coming right down on the bark; and that then, almost immediately, the steamer came in sight, heading directly for the starboard side of the bark. The man on the lookout at the bow of the bark, and who was the man who was blowing the horn, was drowned in the confusion which ensued upon the collision.

The theory of the claimants, in order to be maintainable, requires not only that the bark and the steamer should have been approaching each other about end on, but that the bark should have starboarded to an extent sufficient to have carried her to the same place to which the steamer was carried by her porting of six points or six points and a half, so as to be there struck at right angles, about amidships, on her starboard side, by the stem of the steamer. The whistle of the steamer was undoubtedly heard by the bark before the fog-horn of the bark was heard by the steamer. The bark did not starboard at all until after the second whistle of the steamer was heard, and then she starboarded, at the utmost, not over a point and a half, if as much. The steamer, the moment she heard the fog-horn of the bark, put her helm hard-a-port and stopped and reversed. If the vessels had been meeting end on, the greater speed of the steamer, when she so ported, would unquestionably have carried her safely across the bows of the bark, even with the starboarding of the bark to the extent she did starboard. The claim on the part of the steamer, that the bark was heading north northeast at the time of the collision, and that, therefore, as the steamer headed north northwest at that time, the bark was struck at an angle of forty-five degrees, angling towards her bow, requires that the bark should have starboarded five points and a half, and traversed, between the time the second whistle from the steamer was heard and the actual collision, the distance from the line of the course of the steamer to the point of collision. The evidence shows that this was not the case. The fact is, that the bark was well off the starboard hand of the steamer, and that the steamer was grossly in fault in porting in ignorance of the true position of the vessel whose fog-horn she heard. In face of the actual porting by the steamer, the only defence that could be suggested for her was, that the bark was directly ahead of her, and in the line of her course, and starboarded. The libel was filed on the 17th of September, 1869. The master and wheelsman of the bark was examined by deposition, September 30th, 1869. By the libel, it appeared that the bark's course was east half north, and that the steamer's whistle was heard well off to the starboard of the bark. But it did not appear by the libel that the bark had starboarded at all. That did appear by the depositions of the master and the wheelsman of the bark. With this information, the answer of the steamer was put in, on the 19th of October, 1869. It avers, that the wind was south to south southwest, and free for the bark, and that the bark starboarded her helm, and that the collision was occasioned by the negligence and want of care and skill of those on board of the bark in, among other things, starboarding her helm. It does not aver that the vessels were meeting end on or nearly end on, nor does it aver what was the course either of the steamer or of the bark, although it avers that the sound of the fog-horn was heard directly ahead of the steamer. Nor does it aver that the bark, by starboarding, changed her course. The theory of the answer manifestly is, that the bark ought to have ported her helm, and was in fault in not porting, and in starboarding instead of porting, and that the steamer made a proper manoeuvre in porting when she heard a fog-horn directly ahead of her, and was, therefore, without fault. Hence, the allegation in the answer, and such tes-

timony in regard to the wind, as there is on the part of the steamer, that the wind was free for the bark and that she starboarded. This means that the wind was free for her, so that she could have ported and yet not have come into the wind, and that, if she had ported, meeting the steamer end on, there would have been no collision, as the steamer also ported. From the fact that the steamer ported to the extent of six points or more from a course west half south, and that the witnesses for the bark had testified to the starboarding of the bark half a point from a course east half north, the conclusion was jumped at by the only witness for the steamer, Fokkes, her second officer, who testifies on the subject, that the vessels were meeting end on, and that the bark caused the collision by starboarding and not porting. This is shown by his testimony. He was asked: "You have stated that your steamer was steering west half south at the time you heard the fog-horn, and when the order was given to port. Suppose the bark was steering east half north, in what relative position would that bring or place the steamer and the bark at that time?" He answered: "Stem to stem." He was also asked: "You have stated, in your direct testimony, that, for some time prior to, and at the time of, the collision, the wind was south southwest. How was that wind for the bark, on the course she was going before the collision?" He answered: "She had a free wind, and could easily put her helm a-port without having her sails aback."

Independently of the question as to whether the rate of speed of the steamer was at all justifiable, there was gross incompetency in her management. She ported in entire ignorance of the course or position of the vessel whose fog-horn she heard. She should have stopped and reversed, without changing her helm. She could only infer, from hearing the fog-horn, that it came from a sailing vessel under way. She is, therefore, chargeable with the knowledge, that, if there was any risk of collision, it was her duty to keep out of the way of the sailing vessel, and also her duty to slacken her speed, and, if necessary, to stop and reverse, and the duty of the sailing vessel to keep her course. Yet Fokkes shows his entire ignorance of the rule of the road, and the same ignorance must have existed on the part of his superior officers, judging by the course they pursued. Thus, Fokkes was asked: "Why was the steamer's helm ported?" He answered: "Because, it is the law for two vessels meeting at sea end on, both to put their helms a-port, to go clear of each other."

The attempt to show that the helm of the bark was put hard-a-starboard, by the testimony of those who saw its position in the water after the bark had been capsized, and while a boat from the steamer was engaged in saving her crew, cannot outweigh the direct testimony of those on the bark. Cap-

sized as the bark was, and lying on her port side, her rudder may very well have hung over to port, without her helm having been starboarded to any greater extent than is testified to by Nicholson.

In any view I can take of the evidence in this case, I must regard the steamer as wholly in fault, and the bark as entirely free from fault. There must, therefore, be a decree for the libellants, with costs, with a reference to a commissioner to ascertain the damages sustained by the libellants.

[This decision was affirmed in the circuit court in an opinion by Woodruff, Circuit Judge. Case No. 6,007.]