THE CITY OF NEW YORK.

MACHAM *et al.* *v.* THE CITY OF NEW YORK *et al.*

*Circuit Court, S. D. New York.* June 25, 1888.)

1. COLLISION—FOG—STEAMER AND SAILING VESSEL—RATE OF SPEED.

The steamer City of New York, outward bound, at 11 o'clock at night, in a fog in which vessels could not be discovered at more than one-eighth of a mile distant, was steaming 11 knots an hour, all she could do against the wind, headed S. by W. ½ W. The bark H., headed about N. E., was sailing about four knots. The watch on the steamer heard the fog-horn of the bark about two minutes before the collision, and thought from the sound that she was about one point off the starboard bow. The steamer's wheel was put hard a-starboard, and the steamer continued at full speed for about a minute, when the bark was seen, going eastward across the steamer's bow. Alarm whistles were sounded, the bark luffed to starboard, the steamer's engines were reversed, and her wheel ported. She was then not over 150 feet from the bark, and her headway could not be stopped. She struck the bark in her port side, and the latter sank almost instantly. *Held,* that the steamer violated both injunctions of the twenty-first sailing rule, in that she did not go at a moderate speed in a fog, and did not slacken speed after hearing the bark's horn, but kept on until the danger was imminent.

2. SAME—CHANGE OF COURSE.

The steamer also was to blame in her movement to port under a hard a-starboard wheel, when she could not reliably locate the bark's position by a single signal of her fog-horn.

3. SAME—INJUDICIOUS ACT IN EMERGENCY.

The bark's change of course in the excitement, when, owing to the misconduct of the steamer, the danger was imminent, and the vessels were within 200 or 300 feet of each other, if injudicious, was not a fault.

In Admiralty. Libel for damages. On appeal from district court. 15 Fed. Rep. 624, 23 Fed. Rep. 616.

FINDINGS OF FACT.

(1) The British bark Helen, an iron vessel of 282 tons register, while on a voyage from Havana to New York city, loaded with sugar, was sunk by collision with the steam-ship City of New York, June 28, 1879, about 10:50 P. M. The captain and three of the seamen of the bark were drowned when the vessel sank. (2) The collision took place at a point off the coast of New Jersey, 6¼ miles from shore, in 10 fathoms of water, 12½ miles from Barnegat light-house, and 9½ miles from Tucker's Beach light-house. The City of New York was a wooden steam-ship, 242 feet long and 1,715 tons register, having a left-handed propeller, and was bound on a voyage from New York to Havana. Her full speed was about 12 knots an hour, and, when going at full speed, her head-

way could not be stopped, by reversing her engines, within a distance of an eighth of a mile. (3) On the night in question the wind was blowing strong from the south-west or the south-south-west. About half an hour preceding the collision the night became foggy; so much so that vessels could not discover one another at a distance of not more than one-eighth of a mile. During this time, and until within about three or four minutes before the collision, the vessels had been approaching each other; the course of the steamer being about S. by W. ½ W., and the course of the bark being about N. E. The steam-ship was going about eleven knots an hour, which was all the speed she could make against the wind; the bark was going about four knots an hour; and each vessel kept her respective course until she heard the fog-signal of the other. (4) During the half hour preceding the collision, three seamen were on the deck of the bark besides the mate; one seaman being at the wheel and two on the lookout forward, alternately blowing the fog-horn, and the bark's lights were properly set and burning. During the same time, the navigation of the steamer was in charge of her second mate; her quartermaster was at the wheel; her engine was in charge of a competent engineer; she had a lookout on the forward deck; and her regulation lights were properly set and burning. The lookout on each vessel was vigilant. Each vessel observed the proper fog-signals. The steamer maintained her full speed against the wind until her engines were reversed just before she struck the bark. (5) Before either vessel discovered the other, those in charge of each heard the fog-signals of the other. At about two minutes prior to the collision, those in charge of the steamer first heard the fog-horn of the bark, and from the apparent direction of the sound thought she was one point off the steamer's starboard bow. Immediately upon hearing the fog-horn the mate ordered the wheel of the steamer put to starboard and hard a-starboard. The order was promptly executed, and the steamer proceeded on under full speed until those in charge discovered the sails of the bark. The steamer had run under a hard a-starboard helm at least a minute before the bark was seen. Those in charge of the steamer then discovered that the bark's course was eastward across the steamer's bow. The steamer then sounded successive whistles of alarm, and those in charge saw the bark luffing to the starboard. Thereupon the mate immediately ordered the steamer's engines reversed, and her wheel ported, and this order was promptly executed; but she was then close to the bark, probably not to exceed 150 feet, and her headway could not be stopped in time to avoid a collision, and the steamer struck the bark on the bark's port side, her stem striking just forward of the bark's mizzen rigging with such force that she penetrated the bark a distance of five feet, and the bark sank almost instantly. The whistle of the steamer first heard by those in charge of the bark indicated to them that the vessels were quite near to each other. They thought the steamer was approaching bearing abeam on the bark's port side. Immediately after they saw her mast-head light, and then her green light, whereupon the mate told the wheelsman to port the wheel, and called to those below to save themselves. The man at the wheel had hardly got the wheel

over when the steamer struck the bark.   During the time the steamer was running under her hard a-starboard wheel she changed her course to the eastward three or four points, and the bark, after she luffed, changed her course one or two points by the time the vessels came together.   (6) By the collision the bark, her cargo and freight, together with the personal effects of the officers and crew, were totally lost.   The value of the bark, her stores, and pending freight was $16,289.59.   The value of the cargo on board the said bark was the sum of $20,055.43.   The personal effects of Capt. Barclay were of the value of $1,026.25.   The personal effects of the mate, W. H. Taylor, were of the value of $220.83. The personal effects of John Brown were of the value of $100.   The personal effects of George Camilleri were of the value of $73.87.   The personal effects of William Marzan were of the value of $88.   The personal effects of Jens Moller were of the value of $55.   The steamer also received severe injuries, the amount of damage approximating $7,000.

## CONCLUSIONS OF LAW.

(1) The steamer was guilty of fault in violating the twenty-first rule, because she did not slacken her speed when she heard the fog-signals of the bark, and also because she did not go at a moderate speed when in a fog, and also because she changed her course, and kept on at great speed, after she heard the bark's fog-horn before seeing her.   (2) The bark's change of course was an error *in extremis*.   (3) That the libelants are entitled to a decree against the claimants for the loss of the bark Helen and her freight and stores for the sum of $16,289.59, with interest from the 28th of June, 1879; for the loss of the cargo the sum of $20,055.43, with interest from the 13th day of June, 1879; for the loss of personal effects of Capt. Barclay for the sum of $1,026.25, with interest from the 28th of June, 1879; for the loss of the personal effects of William H. Taylor for the sum of $220.83, with interest from the 28th of June, 1879; for the loss of the personal effects of John Brown for the sum of $100, with interest thereon from the 28th of June, 1879; for the loss of the personal effects of George Camelleri for the sum of $73.87, with interest thereon from the 28th of June, 1879; for the loss of the personal effects of William Marzan for the sum of $88, with interest thereon from the 28th of June, 1879; for the loss of the personal effects of Jens Moller for the sum of $55, with interest thereon from the 28th of June, 1879.   The libelants are awarded their costs in the district court and in this court, to be taxed.

*R. D. Benedict*, for claimants.

*George A. Black*, for libelant.

WALLACE, J.   By the decree of the district court both vessels were found in fault for the collision which is the subject of this suit, and an apportionment of the loss was decreed.   Both the libelants and the claimants have appealed.   Although the claimants insist that there was no fault on the part of the steamer, and that the collision was wholly the result of the fault of the bark in making a change of course at a time when

otherwise the steamer would have safely avoided her, the faults on the part of the steamer are so clearly established by the evidence as to devolve upon the claimants the burden of showing that the bark was guilty of contributory fault. The testimony of all the more important witnesses in the district court for both vessels was taken by deposition; the mate of the steamer being the only person who saw all that took place, who was examined in the presence of the district judge. Some additional testimony has been taken by the parties in this court; but in the view of the facts which has been reached, it has not been deemed of sufficient importance to require special consideration. The undisputed facts in the case are that the collision took place in a fog, June 28, 1879, at about 11 o'clock at night, at a point about 6¼ miles off the coast of New Jersey, 12½ miles from Barnegat light-house and 9½ miles from Tucker's Beach light-house. The steamer struck the bark on the latter's port side, just forward of the mizzen rigging, penetrating into her side about five feet, and sinking her almost instantly. The Helen was an iron vessel of 282 tons register, 122 feet long, and was bound on a voyage from Havana to New York city, laden with a cargo of sugar. She was commanded by Capt. Barclay, and her crew consisted of first and second mate, four able seamen, and two boys. The captain and three of the crew were drowned when the vessel sunk. The captain went below about 8 o'clock in the evening, after giving directions about the course to be kept by the bark, and left her navigation in command of the mate. The seaman who was at the wheel at this time was one of those who were drowned. He remained at the wheel until about 10 o'clock, when one of the seamen then on the lookout was called to take his place, and he was sent forward to the lookout. From this time until the collision took place, the mate was on deck, one seaman was at the wheel, and two seamen were on the lookout forward, alternately blowing the fog-horn. One of the seamen who was below in the forecastle, and had been kept awake by the noise of the fog-horn, got on deck as the vessels struck, and was the only one of those below who was saved. The City of New York was a wooden steam-ship, 242 feet long and 1,715 tons register. She was bound on a voyage from New York city to Havana. Her full steam speed was about 12 knots an hour, and her propeller was left-handed. Her navigation at the time was in charge of her second mate, her quartermaster was at the wheel, her engine was in charge of a competent engineer, and she had a lookout stationed on the forward deck. Her course, up to the time she heard the first signals of the bark, from about 10 o'clock, was about S. by W. ½ W. The testimony indicates that both vessels observed all the regulations in regard to lights and fog-signals, and that the lookout on each was properly stationed, and reasonably vigilant. The testimony also shows that about 10 o'clock, or shortly after, a fog of such density set in that vessels could not discover one another at a distance of more than an eighth of a mile, and at intervals could not do so at a considerably shorter distance. The quartermaster of the steamer testified, in answer to the question how far he could see in the fog, that he could see the length of the steamer. The first officer of the steamer, who came on

deck while the vessels were in contact, testified that he could not see the length of the bark; and the captain of the steamer testifies that after the collision he could not see the boats sent out to assist the crew of the bark from the time they left the side of the steamer until they got back.

It is not open to fair doubt that after the night became foggy the steamer maintained substantially her full rate of speed, going as she was against the wind, and without sails, until her engines were reversed immediately before striking the bark. The testimony denotes that the wind was blowing from the south-west, or between that point and south-south-west, and that the steamer kept on at a speed of 11 knots an hour. Neither is it open to fair doubt that, at the speed maintained by her at the time, her headway could not be stopped, by reversing her engines, within a distance of an eighth of a mile. When those in charge of the steamer first heard the fog-horn of the bark, they assumed, from the apparent direction of the sound, that her bearing was about one point off the steamer's starboard bow. Immediately upon hearing the fog-horn the mate ordered the wheel of the steamer put to starboard and hard a-starboard. The order was promptly executed. When the bark became visible to them they discovered that her course was eastward across the steamer's bow, and then saw her changing her direction and luffing to the starboard of her previous course. Thereupon the mate immediately ordered the steamer's engines reversed, and her wheel ported. This order was promptly executed, but the steamer's headway could not be stopped in time to avoid a collision. It is entirely clear that the steamer disregarded both of the injunctions of the twenty-first sailing rule. She did not slacken her speed when approaching another vessel, so as to involve risk of collision; and she did not go at a moderate speed in a fog. That she was approaching another vessel so as to involve risk of collision from the time those in charge heard the first fog-signal of the bark is sufficiently manifest by their conduct in putting her wheel to starboard and hard a-starboard instantaneously upon hearing the fog-horn; and it is conceded by all her witnesses that she kept on at her full previous speed until the risk of collision became imminent, if not inevitable. That she was not going at a moderate speed in a fog is conclusively established by the fact that she was maintaining such speed that she could not effectually check herself, by reversing her engines, so as to avoid collision within the distance at which in the condition of the fog another vessel could be seen. In stating that the fog was such that vessels could not discover one another more than an eighth of a mile distant, and that the steamer was not capable, when going at substantially full speed, of stopping her headway through the water within a distance of an eighth of a mile, the most liberal opinion in favor of the steamer has been expressed which can possibly be indulged upon the evidence. As is stated by Capt. Dearborn, one of the expert witnesses, when vessels can be seen in a fog at night an eighth of a mile there is not much of a fog. The committee appointed by the British association to investigate the subject state in their report that "it appears, both from the experiments made by the committee and from other evidence, that the distance required by a screw-

steamer to bring herself to rest from full speed by the reversal of her screw is independent, or nearly so, of the power of her engines, but depends upon the size and build of the ship, and generally lies between four and six times the ship's length." The rule by which to determine whether a given rate of speed is moderate or excessive, in view of the particular circumstances of the occasion, is that such speed only is moderate as will permit the steamer seasonably and effectually to avoid the collision by slackening speed, or by stopping and reversing, within the distance at which an approaching vessel can be seen. Besides these infractions of the positive rules of navigation the steamer was guilty of fault by her movement to port under a hard a-starboard wheel, with unabated speed, executed when she did not know the location or course of the bark. She could not reliably locate the bearing of the bark by a single signal of the bark's fog-horn. So delusive is the apparent direction of sounds amid banks of fog in locating the true source that successive observations are commonly resorted to for greater certainty, and even then such are the aberrations that mistake is not infrequent. She could only conjecture the course of the bark, and could not know whether the bark was approaching, or was proceeding in the same direction with herself, or whether she was running free or beating to windward on the starboard tack. Under such cirumstances she had no right to act upon conjecture; her duty was to reduce her speed to the lowest rate compatible with her efficient control, and proceed circumspectly until she could locate the bark, and ascertain her course, or until further signals indicated that the bark was beyond the range of risk. *The Northern Indiana*, 3 Blatchf. 92; *The Hammonia*, 4 Ben. 515, affirmed 11 Blatchf. 413; *The Perth*, 3 Hagg. Adm. 414; *The James Watt*, 2 W. Rob. 270. When such faults on the part of a steam-ship are shown, her owners are *prima facie* responsible for the collision, and must exonerate themselves by satisfactory proof that the sailing vessel was also guilty of misconduct which produced or contributed to the collision. *Waring* v. *Clarke*, 5 How. 465; *The Oregon*, 18 How. 570.

The fault imputed to the bark by the claimants is the only one which could plausibly be assigned under the circumstances of the case,—that she changed her course after she became visible to those who were in charge of the steamer. Inasmuch as all the witnesses agree that this took place when the vessels were in plain sight of each other, the case resolves itself into the inquiry how far the vessels were apart when this change was made. The witnesses for the bark, while they differ in the details given, agree that the fog-whistle of the steamer, when first heard by them, seemed to indicate by the direction of the sound that the steamer's bearing was abeam on the bark's port bow; that very shortly after hearing her whistle they saw the steamer's mast-head light, and then her green light, so near as to render a collision apparently inevitable; and that then the mate of the bark told the man at the wheel to port the bark's wheel, and shouted to those who were below to save themselves. The testimony of the wheelsman, the lookout, and the engineer of the steamer so strongly confirms the testimony of the witnesses for the bark,

to the effect that the bark's change of course was not made until the vessels were so close together that a collision was unavoidable, that it does not seem necessary to devote any time to the attempt to ascertain what the course of the bark was previously to the time this change was made. All the witnesses for the steamer agree that the bark's change of course took place under their observation, and that the steamer sounded an alarm of successive blasts of her steam-whistle, and reversed her engines. The only successive blasts of the steamer's whistle which were given while the vessels were approaching each other were given at the same time when the order to reverse was given by her mate. The mate testifies that when he saw the bark opening out her masts so that he could see the sails between the masts, he ordered the wheelsman to port the helm, blew a general alarm at the steam-whistle, and rang the engine bells to slow, stop, and reverse, and that he was not more than four seconds in blowing the alarm, and four more in completing the signal to reverse. The engineer testifies that the sound of the gong had not stopped when his engine was reversed; that he stood where he could lay his hand on the reversing gear; and that not more than from 15 to 20 seconds elapsed after hearing the first of the four bells of the order to slow, stop, and back before he felt the jar of the collision. The captain of the steamer was in the room abaft of the pilot-house, was awakened by the alarm-whistles, and stepped instantly into the pilot-house; and he testifies that when he got there the vessels were then close together, or, giving his estimate, were about 40 feet apart. The violence of the blow given by the steamer to the bark shows that the steamer was under rapid headway when she struck the bark. According to the testimony of the steamer's lookout, the bark did not change her course until after the alarm-blasts of the steamer's whistle were sounded, and the steamer's wheelsman corroborates the testimony of the lookout in this respect. The mate of the steamer is the only witness for the claimants who states that the bark changed her course before the alarm was sounded. The helmsman of the bark testifies that he had not got her wheel fairly over in executing the order to port the helm, when the steamer struck the bark.

It is insisted for the claimant that the bark changed her course four or five points to the starboard. Doubtless, if this were true, such a change could not have been made when the vessels were within 200 or 300 feet of each other. If it could be demonstrated that at the time of the collision the bark was headed about E., and that her course previous to the change was N. E., the argument for the steamer would be convincing; but this cannot be demonstrated unless the testimony of the helmsman of the steamer, who gives the course on which the steamer was headed when the bark's change of course took place, and also when the collision took place, is accepted as correct. It is highly improbable that, in the excitement and confusion of the moment, the helmsman of the steamer looked at his compass so carefully as to accurately note the steamer's course when he was ordered to put his wheel hard a-port, and again when the collision took place. Equally improbable is his testimony that, while the steamer was under a hard a-starboard helm, her course was only

changed about three-quarters of a point, although she was running at full speed for a minute under that helm, and that, while she was under her helm hard a-port, at the time she was reversing her engines, her course was changed to a point and three-quarters to starboard. She could not have been a half minute under the helm hard a-port. The general course of the bark after 8 o'clock in the evening may be assumed to have been about N. E., or N. E. ½ N. This was the conclusion reached by the district judge, upon considerations which are very convincingly stated in his opinion. It may be conceded that her mate, who is the only witness who attempts to give her course by the compass, is not entitled to any credit. The testimony of the diver of the Marine Wrecking Company, who visited the wreck a few days after the collision, shows that she was lying upon the bottom of the ocean headed about N. N. E., on a line parallel with the shore. This fact alone might not be enough to authorize the conclusion that she was headed N. N. E. at the time of the collision; but it is entitled to consideration as measurably supporting that theory, and is more persuasive in fixing her heading approximately than are the conjectural opinions of the witnesses, formed in the excitement and confusion of the moment, who think she was headed about E. If she was headed about N. N. E. when she was struck by the steamer, she did not change her course more than a point and a half under her port helm, and such a change would be consistent with the testimony respecting the proximity to the vessels when it was made which has been adverted to. It is not unreasonable to infer that the steamer, while running a minute under her hard a-starboard helm, thus covering a distance of four times her length, changed her course to the eastward three or four points, and that in the short distance during which she was under her hard a-port helm with her engines reversed she could not have been influenced materially to starboard. See White, Nav. Arch. 630–637. Upon this assumption, if the bark's course was changed one or two points, the steamer would have struck the bark at the angle shown in the diagrams of the libelant's witness Hagerty, and the claimant's witness Brown. It may be that the mate of the steamer is correct in the statement that the bark changed her course before the sounding of the steamer's alarm-whistles, and that the helmsman and lookout of the steamer are mistaken in supposing the change to have been made afterwards. But in view of the testimony of the steamer's witnesses as to what took place after the bark became visible to them, it can hardly be doubted that a half minute must have elapsed after that time before the change of course was made. As the bark was not visible more than an eighth of a mile away, and as the vessels were approaching each other not far from the rate of 1,400 feet a minute, it is plain that they must have been very near together when the change was made; and even if a less time than a half minute elapsed, they were probably within 200 or 300 feet of each other. For these reasons the conclusion is reached that the bark's change of course was not a fault, but, if injudicious, was made when the vessels were very near to each other, and was caused by an error of judgment on the part of the mate, committed in the excitement and alarm of the

moment, when, owing to the misconduct of the steamer, the vessels were in a situation which did not permit him to deliberate. The case is there-fore one for the application of the rule which is well stated in *The Carroll*, 8 Wall. 302:

· "Fault on the part of the sailing vessel at the moment preceding collision does not absolve a steamer which has suffered herself and a sailing vessel to get in such dangerous proximity as to cause inevitable alarm and confusion, and collision as a consequence. The steamer, as having committed a far greater fault in allowing such proximity to be brought about, is chargeable with all the damages resulting from the collision."