In re EASTERN DREDGING CO.

THE SCOW NO. 34.

(District Court, D. Massachusetts. March 15, 1906.)

No. 1,669.

1. SHIPPING—PROCEEDING FOR LIMITATION OF LIABILITY—PROCEDURE.

In a proceeding by the owner of a vessel for limitation of liability on account of a collision, where an answer is filed by the owner of the other vessel setting up a claim for damages, the question of the knowledge or privity of the petitioner, though jurisdictional, and the question of liability for the collision, where both are put in issue by the pleadings and are to be determined largely upon the same evidence, may properly be heard at the same time as a matter of convenience, and the court is not required to hear and dispose of the jurisdictional question separately.

[Ed. Note.—Limitation of liability of vessel owner, see note to The Longfellow, 45 C. C. A. 387.]

2. COLLISION—VESSEL ADRIFT—DEFENSES.

If damage is done by a vessel adrift, her owner is allowed to show affirmatively, if he can, that her drifting was the result of inevitable accident or a vis major which human skill and precaution and a proper exercise of nautical skill could not have prevented; and such proof establishes a defense, even in a suit in rem against the vessel herself.

3. SAME—PERMITTING SCOW TO GO ADRIFT—NEGLIGENCE OF WATCHMAN.

Petitioner, a corporation, left two of its mud scows overnight made fast to a permanent mooring near the shore in accordance with its custom. They were fastened to the mooring by pennants and to each other by a cross-line, and at 6 o'clock lights were set on each. During the evening one went adrift, and at 10 o'clock claimant's ferryboat came into collision with it and was so injured that she sank. At that time there was

no light on the scow, and when found the next morning there were no lines on her bitts and no lights on board, although there had been two the evening before. The pennant was found attached to the mooring and intact. Petitioner kept no watchman on board the scows, but kept one on a dredge, which was moored near by, whose duty it was to care for the scows and see that their lights were kept burning. During the evening in question he was part of the time below, and once went on shore. He saw the lights on the scows in the earlier part of the evening, but when he went to the mooring at 9 o'clock found that one scow was gone; but, supposing that it had been taken by a towboat, he paid no further attention to it. The night was clear, with little wind. *Held,* that the uncertainty as to the manner in which the scow went adrift and lost her lights did not relieve her from fault for the collision; the watchman having clearly been negligent.

4. SHIPPING—LIMITATION OF LIABILITY FOR COLLISION—PRIVITY OR KNOWL-EDGE OF OWNER.

The precautions taken by the petitioner, however, to secure and care for the scow, were sufficient; and, it appearing that none of its managing officers had knowledge of her going adrift or of the negligence of the watchman, it was not chargeable with privity or knowledge which precluded it from limiting its liability.

5. COLLISION—DUTY TO MAINTAIN ANCHOR WATCH ON SCOW—MASSACHUSETTS STATUTE.

St. Mass. 1848, p. 800, c. 314, § 4, requiring every vessel anchoring in Boston Harbor to keep an anchor watch at all times, does not apply to a mud scow having no accommodations for a watchman, when made fast to a permanent mooring near a dredge, in connection with which she is used and on board of which a watchman is kept to look after both vessels.

6. SAME—FERRYBOAT AND DRIFTING SCOW—LOOKOUT.

A ferryboat, which came into collision at night with a mud scow drifting without lights, *held* not chargeable with contributory fault because she had no lookout in the bow; a lookout having been kept from the pilot house, which was sufficient in respect to any other vessel carrying proper lights.

In Admiralty.
See 138 Fed. 942.

Carver & Blodgett, for Eastern Dredging. Co.
John O. Teele and Arthur P. Teele, for Winnisimmet Co.

DODGE, District Judge. The special plea denying the jurisdiction of the court, filed by the Winnisimmet Company March 5, 1905, was overruled by the court June 6, 1905, on the grounds stated in the opinion of that date. On June 24th the Winnisimmet Company filed an answer to the petition and a proof of claim of its damages alleged to have been suffered in the collision which the petition describes, reserving, however, its right to object to the jurisdiction of the court under the special plea referred to. A hearing has now been had upon the questions raised by the answer and proof of claim.

The petition for limitation of liability alleges that the collision and the damage resulting therefrom were in no event done, occasioned, or incurred with the privity or knowledge of the petitioner, but were without its privity or knowledge; and it denies the petitioner's liability for any damage resulting from the collision, alleging that the collision was in no respect due to fault on its part or on the part of its Scow No. 34, but was caused wholly by the fault of the respondent's ferryboat City of Boston, or by persons unknown, or by both.

In its answer to the petition the Winnisimmet Company takes issue with the petitioner on both propositions, denying that the collision and damage were without the petitioner's privity or knowledge, and alleging that the collision was wholly due to fault on the part of the petitioner or its scow.

At the hearing the respondent contended that the petitioner should be required first to show that the collision happened without its privity or knowledge, and that the court should not, until that fact was established, enter upon any inquiry regarding responsibility for the collision. This contention was overruled. While it is true that the court, no libel seeking to recover damages sustained in the collision being before it, is without jurisdiction to decide the question of liability for the collision unless this petition can be maintained, and while it is also true that the petition can only be maintained upon proof to be made by the petitioner that the collision was without its privity or knowledge, yet the question as to the petitioner's privity or knowledge and the question as to its liability for the collision are now both raised by the pleadings in the case, both involve the investigation of the same facts, and the evidence material upon one question is for the most part the same as that which is material upon the other. A separate hearing and decision of the two questions would involve so much inconvenience and waste of time that it may be said to be practically impossible. The procedure, when limitation of liability is sought in admiralty, is understood to vary in some respects in the different districts; but no case has been found involving both the questions referred to, in which they have been thus separately heard. Both questions appear to have been in all cases dealt with at the same hearing, and that method has been followed in this case.

The following facts alleged by the petitioner are admitted by the answer to the petition: On Sunday, March 13, 1904, the petitioner was sole owner of Scow No. 34, which was an ordinary mud scow 110 feet long and 34 feet wide, built in New York in the year 1900, and employed by the petitioner in carrying mud from Boston Harbor to the dumping ground in fulfillment of its contract for excavation with the United States government. At about 10 o'clock in the evening of that day the respondent's ferryboat City of Boston, while on its regular trip between the city proper and East Boston, came into collision with the scow, which was at that time adrift in the harbor.

It is not disputed that by the collision the ferryboat was damaged and caused to sink.

I find on the evidence before me that the circumstances of the collision were as follows: The ferryboat was making one of her regular trips from Boston toward Chelsea, having left Boston at 10 o'clock in the evening. It was a clear, starlight night. There was no moon. It was dark on the water, there being wind enough to roughen its surface sufficiently to prevent any reflection of lights on shore. In the ferryboat's pilot house were the captain, who was steering, and one pilot or deck hand. Both of them were keeping lookout from the windows of the pilot house. Another pilot or deck hand was on duty below. He was in one of the cabins when the collision

happened. These three men, with the engineer and fireman, who were below, composed the entire crew of the ferryboat. There were some passengers on board. The ferryboat was on her regular course, had completed the greater part of the trip, and was nearing her Chelsea landing, but was still in the channel between East Boston and Charlestown, at a point nearest the eastern side thereof, off Cunningham's Wharf, in East Boston, when she struck the scow. Nothing whatever was seen of the scow on board the ferryboat before the collision, nor was she seen from the ferryboat after it had taken place. She had no masts, houses, or other structures rising above her deck, and no part of her hull rose more than two or three feet above the water. She had a load of mud on board, which in some places came two feet above the highest part of her hull. The damage sustained by the ferryboat was damage to her hull underneath the guards, which were sufficiently high above water to permit the scow to pass underneath them without striking them. The scow was drifting at the time, with no one on board and without lights of any kind. Of the absence of any light on board her I am satisfied by the evidence of the men in the ferryboat's pilot house. I have no doubt that they would have seen the light if there had been any. The scow was found in the neighborhood soon afterward by a tugboat which went to look for her, and when found was in the condition which is later described below.

1. The first question to be considered is as to the liability of the scow or her owner. Looking no further than the circumstances which immediately attended the actual collision, and having regard only to the navigation of the scow at the time it occurred, there is, of course, no question that the scow was in fault. She had no one on board' under circumstances which required her to be under proper control. She was unlighted under circumstances which required her to be showing lights of some kind. Just what lights such a craft should have been showing it is unnecessary to consider, inasmuch as she showed none at all. As she was, she was a danger to all other craft navigating the channel in which the ferryboat ran against her. The mere fact that she was thus endangering navigation in the harbor is of itself enough to establish fault on her part in regard to the collision, if the inquiry is to be carried no further.

The principle, however, that a vessel which has damaged another by navigation in violation of law may be treated in admiralty as an offending thing, herself the wrongdoer and liable for the damage done, is not carried so far in cases of this kind as to preclude further inquiry absolutely and to warrant a conclusive presumption that the owner of the scow was negligent. If damage is done by a vessel adrift, her owner is allowed to show affirmatively, if he can, that her drifting was the result of inevitable accident or a vis major which human skill and precaution and a proper display of nautical skill could not have prevented. The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85. Such proof by the owner establishes a defense, even in a suit in rem against the vessel herself. In these proceedings the issue is as to the personal liability of the owner. The owner's liability arising from its

negligence is what is denied in its petition and alleged in the answer and claim of damages. The negligence alleged is that the scow was left insecurely moored and unguarded by crew, or by watchmen, or otherwise, so that she floated as a derelict across the harbor, without guards or lights. The petitioner's averments, on the other hand, are that she had been properly and securely made fast at her mooring ground, that the lines whereby she was secured were not parted, and that they had evidently been unfastened by persons unknown, for whose acts it was not responsible. .

The petitioner, as the evidence in the case shows, was accustomed to keep its scows, when not in actual use, or when loaded and waiting to be towed to the dumping ground, at a mooring 200 or 300 feet from shore, off the Charlestown Navy Yard, not quite half a mile distant from the place where the collision occurred, and on the opposite or western side of the channel between Charlestown and East Boston. On the day before the collision, Saturday, March 12th, Scow 34, loaded and ready to be towed to the dumping ground, and also another scow, empty, had been placed at this mooring. The dredge Bothfield. also belonging to the petitioner, was at work, also off the Navy Yard and about the same distance from shore, at a place about 500 feet distant from the mooring where the scows were placed. Both scows were at the mooring during the day on Sunday. No dredging work appears to have been done on Sundays, and the dumping of loaded scows could not, according to the regulations governing the contract work, be done between midnight on Saturday and midnight on Sunday. No watchman was kept at night on board the petitioner's scows when at the mooring, and there was none kept on these scows. There was no shelter for them on board the scows. A watchman was kept at night on board the dredge. The practice was to set lights on the scows at sunset, and then to leave them with no one on board until morning. Setting the lights on board was done by the petitioner's towboats. The watchman on the dredge was relied on to see that the lights on the scows were kept burning during the night, and, if any light went out, to investigate and fill or restore it. The captain of the dredge was relied on to see that lights were set on the scows, if the towboats failed to do it. The dredge people were instructed to supply any deficiency occurring in the lights, and the towboats, as they went about the harbor, had orders to see that no scow was left unlighted. On Sunday nights the only man on duty on the dredge would be the watchman referred to.

The evidence further shows that Scow 34 was found to be leaking on Sunday afternoon and that two of the petitioner's towboats went to her and pumped her out. On these boats, besides their captains and crews, were Capt. Dickinson, employed by the petitioner as superintendent of dredging, and Capt. Bogan, employed by the petitioner as assistant to Mr. Gerrish, its secretary, treasurer, and general manager. Both boats left the mooring at a few minutes before 6 o'clock, having seen that proper lights were set on the scows, that they were securely fastened to the mooring by the two mooring pennants wherewith it was provided, and that the scows were also lying alongside

each other, properly secured in that position by a cross-line from one to the other. The lights set were burning properly when the towboats departed. Two lights were left burning on Scow 34, and one light on the empty scow.

It further appears that two men were on board the dredge when the towboats left the scows thus moored and lighted, one of whom was the night watchman. He occupied himself during the evening with various duties about the dredge, which kept him below most of the time. He went on deck occasionally to look at the lights on the dredge and on the scows, or to see if any one wanted to come on board. He went to the shore during the evening in a rowboat and brought another man on board. At about 9 o'clock he rowed to the scows, to see if there was any more water in Scow 34. He then found her gone from the mooring and only the empty scow there. The light on this scow was burning. This was the first he knew of any absence of Scow 34 from the mooring. From the dredge he had been able since 6 o'clock to see two lights on the scows, one light higher than the other; but he had not ascertained and could not tell on which scow either light was. The empty scow was so much higher out of water than Scow 34 that, as they had been lying, in looking from the dredge he had not been able to see the hull of Scow 34 at all. Upon finding her gone, he supposed a towboat had taken her away, returned to the dredge, and did nothing further about her. He had seen a towboat about there an hour or more before he found that the scow was gone.

The evidence is that, when the scow was found and examined after the collision, no lanterns were found on board her, the poles or standards to which her lights had been attached were gone or out of place, no lines remained on her bitts where the mooring pennants and crossline had been made fast by the men from the towboats, she showed marks of collision, and the machinery which operated the dumping pockets which held her load of mud had been so broken as to empty a pocket at one end and thereby bring her other end down nearly to the water. Her condition in most of the above respects is to be accounted for by her collision with the ferryboat; but the absence of the lights which had been set on board her cannot, as it seems to me, be so explained. The pennant by which she had been attached to the mooring was found still on the mooring and intact. It was produced at the hearing. Its condition afforded no ground for the belief that it had parted or had been cut.

Further than has been stated, there was nothing in the evidence to show how the scow got adrift, or how her lights came to be missing at the time of the collision. The utmost that can be said to be established in the petitioner's favor is that something out of the ordinary course of events must be supposed to have occurred after 6 o'clock, without the knowledge of the petitioner or its employés, which had the effect of setting the scow adrift and extinguishing her lights.

It is obvious that this is not enough to support the only defense against liability which could avail the petitioner. It was bound, not

only to moor and light the scow at 6 o'clock, but to keep her moored and lighted all night. It does not show that it was prevented from doing this by causes not to have been anticipated or prevented by the exercise of reasonable skill and diligence; and, what is of still more importance for the purposes of these proceedings, the watchman upon whom it principally relied for the purpose of keeping the scow moored and lighted after 6 o'clock is shown to have been negligent in the performance of his duty. If the fact of her disappearance from the mooring without his knowledge at some time between 6 and 9 o'clock would not be sufficient of itself to establish his negligence, it is impossible to say that he kept as careful a watch upon her as was required by his duty to use reasonable care, if he was most of the time below deck, part of the time absent from the dredge altogether, and at no time took the trouble to ascertain to which scow the lights visible from the dredge belonged. If the scows at any time so swung at the mooring that from the dredge he could not see anything of Scow 34 or her lights, this at least required care on his part in watching the place where he knew her to be, sufficient to enable him to know if she moved away from that place. The petitioner is therefore in fault for the collision, because of the fact that its scow was adrift, deserted, and unlighted at the time of the collision, and because the negligence of its watchman prevents it from escaping the responsibility thrown upon it by that fact.

2. The collision was with the petitioner's privity or knowledge, if its managing officers are chargeable with privity or knowledge in regard to it, but not otherwise. "When the owner is a corporation, the privity or knowledge must be that of the managing officers of the corporation." Craig v. Continental Ins. Co., 141 U. S. 638, 646, 12 Sup. Ct. 97, 35 L. Ed. 886. Of the facts and circumstances attending the actual collision no officer had any knowledge at the time, nor did any officer have knowledge regarding what was done just before 6 o'clock in mooring and lighting the scow, or afterward in watching her. No officer was on board either of the tugboats which visited her at 6 o'clock. Capt. Dickinson and Capt. Bogan were not officers, but employés, through whom the general directions of the officers were carried out. Mr. Gerrish, the secretary, treasurer, and general manager, was the managing officer responsible for the general method followed at the Charlestown moorings in securing, lighting, and watching such scows as were from time to time left there, and also for the precautions adopted and ordered by the company for the purpose of keeping such scows properly moored and lighted. If it can be said that this scow was adrift and unlighted in the track of the ferryboat by reason of an inherent insufficiency or defect in the method or precautions referred to, independently of the fidelity with which each employé relied on to carry them out performed his task, Gerrish, and therefore the petitioner, is chargeable with privity or knowledge. This, in my opinion, cannot be said. The usual precautions were sufficient under all ordinary circumstances. The chance of scows moored as these were getting adrift was extremely small. There were no indica-

tions that anything beyond the usual regular precautions would be required on the night in question. As it happened, the watchman on the dredge failed to perform his duty and allowed the scow to get away from her mooring unobserved. This man was a witness at the trial. Nothing has been shown which would warrant the finding that he was an improper person to be employed for his position. Other men were with him on the dredge, and there was a boat which could have been used when required. I see nothing to prevent the natural conclusion that, if he had been as vigilant as the petitioner and its officers had the right to expect him to be, the drifting of the scow or her want of lights would have been prevented, or discovered and remedied in time. The same negligence of an employé, therefore, which prevents the petitioner from escaping liability for the collision, must be taken to have been the cause of the collision, so far as the question of privity or knowledge is concerned, and the petitioner's liability thereby incurred is of the kind which it is the purpose of the statute to limit.

The owner of the ferryboat relies upon a Massachusetts statute of 1847 requiring every vessel anchoring in Boston Harbor to keep an anchor watch at all times. This is section 4, c. 314, p. 800, of the Acts of 1848 (8 Sp. Laws Mass. 1007); and it appears to be now published with the regulations for Boston Harbor issued by the harbor master. I am unable to believe that it was intended to apply or can now apply to scows like Scow 34, when made fast to a permanent mooring near a dredge in connection with which she is used. If applicable, it requires at least one man to be kept on board each scow, day and night, while so moored. I find nothing to indicate that it has ever been so understood as applied. In the absence of any authority to that effect, and in view of the nature and purpose of an "anchor watch" on ordinary vessels (see The Lady Franklin, 2 Lowell, 220, Fed. Cas. No. 7,984), I do not think the petitioner can be held to have violated it by not providing that a man should be actually on board each scow, or by not having had a man on board Scow 34 during the evening of the collision.

3. The remaining inquiry is: Was there negligence on the part of the ferryboat, such as to require a division of the damages? It is contended that her evidence shows her to have been without a proper lookout. So far as the duty of the lookout could be properly attended to from her pilot house, it was sufficiently performed; but the pilot house, some 20 feet above the water, was about 55 feet aft of the bow, and no one was keeping lookout anywhere on board forward of the pilot house. Absence of a lookout at the bow, as far forward as possible, is often held to be fault. Brigham v. Luckenbach (D. C.) 140 Fed. 322. But it is not necessarily fault under all circumstances. It must have contributed to cause the collision. The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711, 36 L. Ed. 469; The Iberia (D. C.) 117 Fed. 718, 723. In the present case I do not think it was a contributing fault. The fault on the scow's part which brought about the collision so far outweighed in importance, as causes tending to bring it about, any deficiency which can reasonably be imputed to the ferryboat's lookout from the fact that it was

not kept from her bow, that she cannot justly be held responsible in any degree. Under such circumstances any reasonable doubt is to be resolved in her favor. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053. As regarded all vessels themselves observing the required precautions, I cannot doubt that the lookout maintained on the ferryboat was entirely sufficient. The possibility that a deserted scow adrift without lights might be encountered in such a place and at such a time was so extremely slight as to make it unreasonable to hold the ferryboat negligent in this respect.

The petitioner is entitled to limit its liability to the owner of the ferryboat for its damages sustained in the collision. For those damages it is liable. There will be a reference to ascertain their amount.