## Petition of CANADIAN PAC. RY. CO.

## THE PRINCESS SOPHIA.

(District Court, W. D. Washington, N. D. September 30, 1921. On Rehearing, November 25, 1921.)

No. 4553.

1. Shipping ⊂⊃203—Limited liability statute to be liberally construed.

The limited liability statute (Rev. St. §§ 4283–4285 [Comp. St. §§ 8021–8023]) was enacted for the benefit of the shipping interest, and should be construed in a spirit of fairness, with a view of giving the shipowner the full benefit of the immunities intended.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes·

**2. Shipping ☞204—Insurance not part of owner's interest in vessel.**

Under Rev. St. § 4283 (Comp. St. § 8021), providing that in certain cases a shipowner shall not be liable beyond the value of his interest in the vessel and her pending freight, insurance collected by him for loss of the vessel when the event occurred for which he seeks limitation of liability, is not a part of his interest in the vessel, and is not required to be surrendered under section 4285 (Comp. St. § 8023).

**3. Shipping ☞205—Owner of foreign ship may limit liability.**

The owner of a foreign vessel may limit his liability, under Rev. St. §§ 4283–4285 (Comp. St. §§ 8021–8023).

**4. Shipping ☞208—"Privity or knowledge" of shipowner.**

"Privity or knowledge," as used in Rev. St. § 4283 (Comp. St. § 8021), imports actual knowledge of the things causing or contributing to the loss, or knowledge or means of knowledge of a condition of things likely to produce or contribute to the loss without adopting proper means to prevent it.

**5. Shipping ☞208—Owner appointing competent agents not liable for their negligence or default, "privity or knowledge."**

Where the owner in good faith appoints a competent agent to equip, man, or maintain a vessel or her machinery, any acts of omission or commission of the agent, not participated in personally by the owner, do not constitute "privity or knowledge," within the meaning of the limitation of liability statute (Rev. St. § 4283 [Comp. St. § 8021]).

**6. Shipping ☞208—Privity or knowledge of corporation must be that of its managing officers.**

The privity or knowledge of a corporation shipowner, which will preclude its limitation of liability under Rev. St. §§ 4283–4285 (Comp. St. §§ 8021–8023), must be that of the managing officers of the corporation.

**7. Shipping ☞209(3)—Certificates of inspection held conclusive evidence of proper equipment.**

An unexpired certificate of inspection by Canadian authorities, held by a Canadian steamship at the time of her sinking, and a United States certificate issued pursuant to Rev. St. § 4400, as amended (Comp. St. § 8152), held to establish that she was properly equipped.

**8. Shipping ☞13—Statute prescribing qualifications held not to apply to foreign vessels.**

The provision of Seamen's Act March 4, 1915, § 13 (Comp. St. § 8363a), that no vessel of 100 tons gross and upward, except those navigating rivers exclusively and the smaller inland lakes, and except as provided in section 1 of this act (section 8306), shall be permitted to depart from any port of the United States unless she has on board a crew having certain stated qualifications, held not to apply to foreign vessels.

**9. Shipping ☞13—Foreign vessels subject to regulatory statute.**

The proviso to Rev. St. § 4488, added by amendment by Seamen's Act March 4, 1915, § 14 (Comp. St. § 8258), "that foreign vessels, leaving ports of the United States, shall comply with the rules herein prescribed as to life-saving appliances, their equipment and the manning of same," applies only to such foreign vessels as are subject to the operation of the original section, as defined in Rev. St. § 4400 (Comp. St. § 8152).

**10. Seamen ☞4—Jones Act not retroactive.**

Seamen's Act March 4, 1915, c. 153, § 20 (Comp. St. § 8337a), as amended by Jones Act June 5, 1920, § 33, enlarging the right of action for injury or death of seamen, is not retroactive, and does not apply to causes of action accruing prior to its enactment.

**11. Shipping ☞207—Liability for injury to passengers or their effects from violation of statute cannot be limited.**

Rev. St. § 4493 (Comp. St. § 8209), providing that vessels and owners shall be liable to passengers for their effects caused by failure to comply

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

with statutory requirements to the full extent of the injury, is supplementary to section 4283 (Comp. St. § 8021), which declares the basic law of liability, and liability for damage coming within the provisions of section 4493 cannot be limited either by owners of domestic vessels or of foreign vessels invoking limitation of liability under section 4283.

On Rehearing.

**12. Shipping ☞207—Violation of navigation rules does not subject owner to unlimited liability for damage to passengers.**

Failure to comply with International Navigation Rules (Comp. St. § 7834 et seq.) does not subject the shipowner to unlimited liability for damage to passengers or their effects, under Rev. St. § 4493 (Comp. St. § 8269), which deprives such owner of the right to limit liability for such damage only when "it happens through any neglect or failure to comply with the provisions of this title," of which the navigation rules are not a part.

**13. Shipping ☞208—Neglect of watchman not with privity of owner.**

While neglect of a shipowner to provide watchman, as required by Rev. St. § 4477 (Comp. St. § 8247), would render such owner liable under section 4493 (Comp. St. § 8269) for injuries to passengers or their effects which happen through such neglect, the neglect of a watchman provided to perform his duty is without privity of the owner.

**14. Shipping ☞13—"Coastwise steam vessel" defined.**

"Coastwise seagoing steam vessels," required by Rev. St. § 4401 (Comp. St. § 8153), to have a licensed pilot, are vessels engaged in the domestic trade or plying between port and port in the same country; as distinguished from those engaged in foreign trade, and the provision does not apply to foreign ships.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Coastwise Steam Vessel.]

In Admiralty. Petition of the Canadian Pacific Railway Company, as owner of the steamship Princess Sophia, for limitation of liability. Granted.

See, also, 269 Fed. 651.

On October 24, 1918, the Princess Sophia, owned by the Canadian Pacific Railway Company, stranded on Vanderbilt reef, in Lynn Canal, Alaska, and during the night of October 25th the vessel foundered, resulting in the loss of the vessel and cargo and of the lives of all of the passengers and crew on board. Suits for damages were asserted. On the 28th day of February, 1919, the owner petitioned this court, seeking to obtain the benefit of sections 4283, 4284, and 4285, R. S. (sections 8021, 8022 and 8023, Comp. St.), limiting the liability for all loss resulting, and prayed that a trustee be appointed, to whom the interest in the steamship and her pending freight might be transferred and monition issued, warning all persons having claims by reason of the catastrophe to present the same within a fixed time, and that the owner be decreed not liable for loss, or, if liable, its liability be limited to the property surrendered. A trustee was named, and the interest of the company in the steamship and pending freight was transferred to him. A lifeboat afterwards discovered was reported to the court, and its value paid to the trustee.

Answers have been filed by many claimants, contesting the petitioner's right to limit liability, and it is affirmatively charged that the petitioner operated the steamship as a common carrier for passengers and freight for hire between the ports of Skagway and Vancouver and Seattle, and extensively advertised throughout Canada and the United States its lines of steamers, particularly that of the Princess Sophia, as being well adapted to navigate the waters of the inside passage to Alaska; that the officers were specially quali-

fied to sail in such waters, and were familiar with the dangers, reefs, and rocks; that the vessel was staunch and strong; that on the 23d of October the Princess Sophia was at Skagway, and that the passengers purchased tickets and went aboard and became passengers for hire, and that its officers failed to carry out such statements, etc.; that the route over which the petitioner operated its vessels was a dangerous route, and extremely difficult to navigate with safety in fog, rain, snowstorm, and thick weather, especially and particularly that portion known as Lynn Canal; that on account of such dangers there is placed a lighthouse at Eldred Rock, 30 miles south of Skagway to the starboard, and a light at Point Sherman, 38 miles south of Skagway, and a light at Sentinal Island, 60 miles south of Skagway; that a vessel navigating such route in clear weather at night could see the light at Point Sherman until the light at Sentinal Island was picked up; that Vanderbilt reef is about 18 miles south of Point Sherman and about 1¾ miles to the westward of the regular route traveled by vessels passing to the starboard; that it is dangerous to attempt the navigation of said passage at night, unless vessels can pick up Point Sherman light before passing Sentinal Island light, before reaching the vicinity of Vanderbilt reef; that vessels cannot undertake said route during heavy rains or snowstorms or thick weather with any degree of safety, and in doing so run great risk of being wrecked, all of which was well known to the officers and agents and employees of the petitioner; that the petitioner made it a practice to run and operate steamers for many years over said route at an unlawful rate of speed in thick weather, and at night when such lights could not be seen, in violation of law and rules of navigation; that such was the usual and customary method of navigating the steamship Sophia, and it was well known, permitted, authorized, and directed by the petitioner and its officers naming various persons; that the Princess Sophia left Skagway at 10:10 p. m. October 23d, at which time she had on board a large and excessive number of passengers, and more than she had accommodations for, and more than she was permitted by law to carry; that she proceeded in a reckless and careless manner, at an excessive rate of speed, and at about 12 o'clock p. m. ran into a blinding snowstorm, and continued to run in such snowstorm without being able to pick up Eldred Rock light, and without being able to pick up Sentinal Island light, and while so running at full speed struck and ran upon Vanderbilt reef at about 2 o'clock a. m. October 24th; that upon striking said reef she rose out of the water and ran the greater part of her length on said reef, with such force as to tear away plates on the bottom of said vessel, and tore a hole from the bow on the starboard side about 2 feet wide, to about 60 feet aft, throwing many passengers from their berths and causing great fear and anxiety among her passengers; that immediately upon striking said reef wireless messages were sent to managing officers of the petitioner at Juneau, Skagway, Ketchikan, Vancouver, Victoria, and Prince Rupert; that shortly thereafter the tide rose, causing the vessel to pound hard upon the rocks and causing great fear and distress among the passengers, which information was conveyed by wireless from the officers of said steamship to the officers and agents of the petitioner; that the lives of the passengers upon said steamship upon her stranding were immediately placed in great peril; that it was the duty of the petitioner, its officers, agents, and employees, to take immediate steps to remove said passengers to places of safety, which could have readily and easily been done by lowering lifeboats of said steamship upon Vanderbilt reef at low tide, and launching the same to the leeward of said reef, and allowing the passengers to step down from the steamer upon said reef and into said lifeboats, which could have readily been done; that lifeboats could then have been rowed to vessels standing by, and her passengers transferred; that such lifeboats could have been rowed to boats within the vicinity of said rocks, where all the passengers could have been landed without difficulty, or that said passengers could have been saved by launching the two aft starboard lifeboats from said vessel into the water and transferring the passengers from lifeboats into other vessels standing near by, or by lowering lifeboats at high tide and transferring the passengers to the vessels standing by; that this could have been done at all times until noon of October 25th, and other methods of transferring passengers were set out; that, in order to save the expense of removing the passen-

gers, petitioner decided to keep the passengers on board the Princess Sophia until it could send one of its vessels from Vancouver to Vanderbilt reef, a distance of 950 miles; that in accordance with such plan petitioner at 11 p. m. October 24th sent the steamship Princess Alice, with directions to go to Vanderbilt reef and take the passengers from the Princess Sophia and carry them to their destination; that it would take about 65 hours for the Princess Alice to reach Vanderbilt reef; that the vessels Peterson, Estebeth, Amy, King & Winge, Cedar, Atlas, Sitka, Elsinore, Osprey, Prince George, and other vessels were in the vicinity of said rock, ready and willing to take the passengers to places of safety, but the petitioner refused to allow the passengers to leave said steamship Sophia, although urgent demands were made of them; that at 4 p. m., October 25th, a violent storm arose in Lynn Canal, with a strong north wind, and at high tide, about 6 p. m., the wind and waves drove said vessel over and across the reef causing her to founder; that it had been generally known for many years that during the fall and winter months violent storms arose suddenly in Lynn Canal with little warning, and that petitioner well knew that such storms were likely to arise at any time, and in case of such storm the Princess Sophia would be driven from the reef and would founder; that notwithstanding this fact petitioner decided to keep and require all passengers to remain upon the Sophia until they could be taken therefrom by the Princess Alice; that the Princess Sophia was unseaworthy when she left Skagway, and that she was not equipped with sufficient lifeboats, life preservers, or life-saving appliances as required by law, and that the crew were insufficient in numbers, and were incompetent and not able-bodied seamen; that many of the crew were sick and unable to perform their duties; that said vessel did not carry pilots; that she was insufficiently manned, equipped, and not provided with a full and complete crew to perform their duties; that Captain Locke, master of the steamship, was 67 years of age, and was not given sufficient pilots, and required to stand long watches, and was under great mental and physical strain, and had become weakened physically and mentally, and was addicted to the use of alcoholic liquors to excess, and was under the influence of liquor on said voyage; that he had become incompetent, and not a safe master, all which was known to petitioner.

Charges of incompetence and unfamiliarity with the waters of Lynn Canal, carelessness and inefficiency, and disqualification were made against the officers of the petitioner, of which the petitioner had knowledge; that the compass and the barometer on the steamship were not in good order and condition; that the compass had not been tested or swung for a long time, and the barometer did not correctly indicate atmospheric pressure and change in weather; that all of the acts of negligence, incompetence, and unseaworthiness were known to the petitioner, and that the petitioner was at fault and guilty of gross negligence in connection with the loss and foundering of said steamship.

The petitioner replies, placing at issue all of the allegations of the affirmative matter, and asserts affirmatively that its managing or supervising officer or agents had instructed the navigating officers and employees connected with the navigation of its steamers, including the steamship Princess Sophia, to navigate and operate said steamers in a cautious and careful manner, and under no circumstances to operate the same in a manner contrary to law and the rules of navigation; that written instructions were furnished to the navigating officers of all the vessels, cautioning them against running risk which by any possibility might result in accident, and to bear in mind that the safety of life and property intrusted to their care is the ruling principle by which they must be governed in the navigation of their ship, and that no saving of time on their voyage is to be sought at the risk of accident; in thick foggy weather and in storms speed must be reduced, and, if soundings are to be had, lead is to be used, and the whistle must be blown at short intervals as prescribed by law; that at least two officers must be on the bridge and a double lookout kept, all water-tight compartments closed, and all possible precautions taken. Such notices were delivered to the officers navigating the steamship Princess Sophia.

It is admitted that after the stranding a wireless message was sent by Captain Locke to Captain Troupe, manager of the British Coast Steamship Service at Victoria, who was operating said vessel, advising Captain Troupe that such vessel had stranded, which message was received at about 9:11 o'clock a. m. October 24th at Victoria. It is admitted that Lowle, agent at Juneau, received a message from the wireless operator at Juneau at about 2:15 a. m. (3:15 ship's time) on October 24th, advising him that the said vessel had stranded on Vanderbilt reef, and was calling for help, and that about 3 o'clock a. m. Lowle received a further message from the wireless operator at Juneau to the effect that the Sophia was pounding heavily and was lowering her boats; states that, since all lives on board were lost, petitioner was not advised as to the conditions existing at and in the vicinity of Vanderbilt reef and on board the vessel at the time she stranded, but from the information conveyed to it by wireless, the lives of the passengers were placed in peril; that the Sophia was in command of a competent and experienced master and officers and crew, and that the advisability as to what should be done with relation to the removal of the passengers were matters to be determined by the master, officers, and crew, who had opportunity to consult with the passengers, many of whom were experienced seamen; that upon the petitioner's direction the Peterson, with a capacity of 150 or 200 passengers, arrived on the scene at 9 a. m. October 24th, the Estebeth, with a capacity of from 85 to 150 passengers, arrived at 10 a. m. the same day, the Amy, with a capacity of 150 passengers, arrived at 11:20 a. m. October 24th, the King and Winge, with a capacity of 100 passengers, arrived at 6:20 p. m. the same day, and the Cedar, with a capacity of 400 passengers, arrived at the rock at 8 p. m., and the Lone Fisherman, Sitka, and Elsinore, with total capacity of 350 to 400 passengers, arrived at the scene the afternoon and evening of October 24th; that there were no other vessels in the vicinity of Juneau capable of rendering any assistance; and further alleges that if there was any fault on the part of any one in the removal of the passengers from the stranded ship, such failure was due to an error in judgment on the part of the navigating officers, and was without privity of knowledge or fault of the petitioner or any of its managing officers or agents. It admits that on the afternoon of October 25th a violent storm was raging in Lynn Canal, and alleges that such storm had been raging throughout the 24th and 25th. It specifically denies that it or any of its officers or agents decided to keep or require the passengers to remain on board the stranded ship awaiting the arrival of the steamship Princess Alice.

Upon motion and stipulation of the parties a commissioner was appointed to take testimony at various places in Alaska and in the city of San Francisco. The issue was finally presented on testimony taken in open court, and at the conclusion was submitted upon such testimony and depositions taken. The only issue now before the court as submitted is as to the right of a limitation of liability.

Bogle, Merritt & Bogle, of Seattle, Wash., for petitioner.

William Martin and H. A. P. Myers, both of Seattle, Wash., for claimants and respondents.

NETERER, District Judge (after stating the facts as above). [1] The first matter to be determined is the liability of the petitioners under the Liability Act. There is a distinction between a general liability for acts of omission or commission with relation to imposed duties and liability under the limited liability act. A distinction, then, between the shipowner's liability under the general maritime law and his liability under the Limited Liability Act must be kept in mind. The shipowner is liable for any damage for loss caused by a defective condition of his vessel, either in equipment or crew, whether he had knowledge or not. The Liability Act, however, abridges the shipowner's liability under the general maritime law, and limits it to his interest in the

ship and freight, unless he has privity or knowledge of deficiency, except as hereinafter stated. Section 4283, R. S. (section 8021, Comp. Stat.):

"The liability of the owner of any vessel * * * for any loss, damage, or injury * * * done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

"The rule of custom from which the liability of the ship's owner is limited is said to have begun in the Middle Ages, and more particularly in the Mediterranean, where commerce first acquired activity, and extended after the fall of the Western Empire. * * *" 7 Cyc. 383.

Mr. Justice Brown, in The Main v. Williams, 152 U. S. 122, 14 Sup. Ct. 486, 38 L. Ed. 381, said:

"By the common law, as administered both in England and America, the personal liability of the owner of a vessel for damages * * * is * * * limited only by the losses and by his ability to respond. * * * The civil law, too, as well as the general law maritime, made no distinction in this particular in favor of shipowners, * * * nor did the ancient Laws of Oleron or Wisby or the Hanse towns suggest any restriction upon such liability. Indeed, it is difficult, if not impossible, to say when and where the restrictions of the modern law originated. They are found in the Consolato del Mare, which, in two separate chapters, expressly limits the liability of the part owner to the value of his share in the ship. Vinnius, an early continental writer, states that by the law of the land the owners were not chargeable beyond the value of the ship and the things that were in it. The Hanseatic Ordinance of 1644 also pronounced the goods of the owner discharged from claims for damages by the sale of the ship to pay them. But however the practice originated, it appears, by the end of the seventeenth century, to have become firmly established among the leading maritime nations of Europe, since the French Ordinance of 1681, which has served as a model for most of the modern maritime codes, declares that the owners of the ship shall be answerable for the acts of the master, but shall be discharged therefrom upon relinquishing the ship and freight * * *"

—and held that:

"Being in derogation of the common law * * * the court should not limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of Congress."

Mr. Justice Nelson, in Moore v. American Transportation Co., 24 How. 1, 16 L. Ed. 674, said:

"The act was designed to promote the building of ships, and to encourage persons engaged in the business of navigation, and to place that of this country upon a footing with England and the continent of Europe."

Mr. Justice Bradley, in The Norwich v. Wright, 13 Wall. 104, 20 L. Ed. 585, said:

"The great object of the law was to encourage shipbuilding and to induce capitalists to invest money in this branch of industry."

Again, in P. & N. Y. S. S. Co. v. Hill, 109 U. S. 588, 3 Sup. Ct. 385, 27 L. Ed. 1038, the same justice uses this language:

"In these provisions of the statute we have sketched in outline a scheme of laws and regulations for the benefit of the shipping interest, the value and importance of which to our maritime commerce can hardly be estimated. Nevertheless, the practical value of the law will largely depend on the man-

ner in which it is administered. If the courts having the execution of it administer it in a spirit of fairness, with a view of giving to ship owners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations (as before stated) will be of the last importance; but if it is administered with a tight and grudging hand, construing every clause most unfavorably against the ship owner, * * * the law will hardly be worth the trouble of its enactment."

Judge Gilbert, in Boston Marine Ins. Co. v. M. R. L. Co., 197 Fed. 703, 117 C. C. A. 97, said:

" * * * The law should be construed in a spirit of fairness, with a view of giving the shipowner the full benefit of the immunities intended. * * * "

This sentiment was taken from La Bourgogne, 210 U. S. 95, 28 Sup. Ct. 664, 52 L. Ed. 973.

[2] The claimant urges at the outset that insurance on the vessel should be considered an interest in the vessel, and transferred to the trustee. Testimony of insurance was offered, but refused, at the trial. This is finally disposed of by the Supreme Court in the City of Norwich, 118 U. S. 468, at page 493, 6 Sup. Ct. 1150, 1156 (30 L. Ed. 134), where the court said:

"The next question to be considered is whether the petitioners were bound to account for the insurance money received by them for the loss of the steamer, as a part of their interest in the same. The statute (section 4283), declares that the liability of the owner shall not exceed the amount or value of his interest in the vessel and her freight; and section 4285 declares that it shall be a sufficient compliance with the law, if he shall transfer his interest in such vessel and freight, for the benefit of the claimants, to a trustee. Is insurance an interest in the vessel or freight insured, within the meaning of the law?"

And after extended discussion (118 U. S. on page 504, 6 Sup. Ct. 1163, 30 L. Ed. 134) it says:

"We are not only satisfied that the law does not compel the shipowner to surrender his insurance in order to have the benefit of limited liability, but that a contrary result would defeat the principal object of the law."

For dissenting opinion see The Great Western, 118 U. S. 526, 6 Sup. Ct. 1172, 30 L. Ed. 156.

[3] It is next urged that, the Sophia being of foreign registry, the owner may not take the benefit of the Limitation Act; but this question is settled by the Supreme Court in The Titanic v. Mellor, 233 U. S. 718, 34 Sup. Ct. 754, 58 L. Ed. 1171, in which it is said:

"The general proposition that a foreign ship may resort to the courts of the United States for a limitation of liability under Rev. Stat. § 4283, is established. The Scotland, 105 U. S. 24; La Bourgogne, 210 U. S. 95."

Recurring to section 4283, supra, it is apparent that the vital issue in limitation of liability is privity or knowledge of the owner.

"Privity means participating with others in the knowledge of a secret transaction; privately knowing; specially in law having any knowledge of or connection with something." Std. Dict.

"To know is to be thoroughly acquainted. In a strict sense the clear and certain apprehension of a truth." Std. Dict.

Judge Sawyer in Lord v. Goodall & C. S. S. Co., Fed. Cas. No. 8,506, said:·

"The meaning of the words 'privity or knowledge' * * * is a personal participation of the owner in some fault, or act of negligence, causing or contributing to the loss."

In McGill v. Mich. S. S. Co., 144 Fed. 788, 75 C. C. A. 518, the Ninth Circuit Court said:

"The right of a shipowner to limit its liability is dependent upon his want of complicity in the acts causing the disaster. * * *"

And in Boston Marine Ins. Co. v. Metropolitan, etc., Co., 197 Fed. 703, 117 C. C. A. 97, the said court said:

"On the voyage on which the collision occurred, the San Pedro was one man short of the number of seamen required by her certificate of inspection, and it is urged that the trial court erred in finding that that shortage was not one of the proximate causes of the loss. * * * We think there was no error, therefore, in the finding that the shortage of the crew was not a *contributory cause of the loss.* It is to be observed in this connection, also, that the manager was not privy to, and had no knowledge of, such shortage. * * *" (Italics mine.)

In Coggeshall, etc., Co. v. Early, 248 Fed. 1, 160 C. C. A. 141, express finding that there was a shortage of the crew was held did not contribute directly to the loss because the owner had no privity or knowledge of such shortage.

[4] Privity or knowledge, as used in the statute, imports actual knowledge causing or contributing to the loss or knowledge, or means of knowledge of a condition of things likely to produce or contribute to the loss without adopting proper means to prevent it. Butler v. Boston S. S. Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017; Craig v. Continental Ins. Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; La Bourgogne, 210 U. S. 95, 28 Sup. Ct. 664, 52 L. Ed. 973; City of Columbus (D. C.) 22 Fed. 460; In re Meyer (D. C.) 74 Fed. 881; The Longfellow, 104 Fed. 360, 45 C. C. A. 379; The Southside (D. C.) 155 Fed. 364; The Rochester (D. C.) 230 Fed. 519. Judge Brown in The Colima (D. C.) 82 Fed. 665, at page 679, said:

"The knowledge or privity that excludes the operation of statute, must therefore be in a measure actual, and not merely constructive; that is, actual through the owner's knowledge, or authorization, or immediate control of the wrongful acts, or conditions, or through some kind of personal participation in them * * *."

Judge Wolverton, in The Indrapura (D. C.) 171 Fed. 929:

"There must be personal participation in the act of delinquency or omission leading to the loss."

Judge Gilbert, in The Annie Faxon, 75 Fed. 312, 21 C. C. A. 366:·

"It is sufficient if the corporation employ, in good faith, a competent person to make such inspection [boiler]. When it has employed such a person in good faith, and has delegated to him that branch of its duty, its liability beyond the value of the vessel and freight ceases. * * *"

Mr. Justice White, in La Bourgogne, supra:

"Mere negligence, pure and simple, in and of itself, does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute."

[5] It appears to be well settled that, where the owner in good faith appoints a competent agent to equip, man, or maintain a vessel or her machinery, any acts of omission or commission of the agents, not participated in personally by the owner, do not constitute privity or knowledge. The Annie Faxon, 75 Fed. 312, 21 C. C. A. 366; The No. 6, 241 Fed. 69, 154 C. C. A. 69; Boston Marine Ins. Co. v. Metropolitan, etc., L. Co., 197 Fed. 703, 117 C. C. A. 97; Quinlan v. Pew, 56 Fed. 111, 5 C. C. A. 438; Craig v. Continental Ins. Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; The Marie Palmer (D. C.) 191 Fed. 79; The Murrell (D. C.) 200 Fed. 826.

Judge Gilbert, in Boston M. I. Co. v. Metropolitan, etc., L. Co., supra, said:

"But we cannot concede that an owner of a vessel, in order to be entitled to limit his liability under the statutes, must, before sending his vessel on her way, acquaint himself with the science of navigation, or acquire expert knowledge concerning his vessel, its equipment, its machinery, or the necessary crew therefor, or must place between himself and the master an intermediary who shall possess such knowledge, and our attention has been directed to no authority which so holds. In Moore v. American Transportation Co., 24 How. 1, 16 L. Ed. 674, the court said: 'The act was designed to promote the building of ships and to encourage persons engaged in the business of navigation.' And in La Bourgogne, the court affirmed that the law was to be administered in a spirit of fairness with the view of giving to shipowners the full benefit of the immunities intended to be secured by it for the encouragement it will afford to commercial operations."

Judge Putnam, in Quinlan v. Pew, supra, said:

"We are also constrained to the belief that this statute, which the Supreme Court directs shall be interpreted broadly, has regard for the usual necessities of the occupations of life, and in that respect intends that owners may avail themselves of the proper facilities common to business men, and be relieved, so far as it is concerned, whenever and so far as they have appointed a suitable representative, be he master, consignee, or other agent, to supervise the ship, either at sea or at the home port or otherwise, and either for fitting her away, or navigating her after she is so fitted away. The law, for the purposes of this case, cannot make a distinction between the owner who has but one vessel, and time and opportunity to give it his personal attention, and the owner who has many vessels, or whose necessities call him long distances from his residence, or whose infirmities, sickness, inexperience, or sex renders him or her incapable of attention to affairs of this nature."

Judge Hanford, in The Jane Gray (D. C.) 99 Fed. 582, said:

"I consider that, for the safety of her passengers, the vessel ought to have carried a sufficient number of life preservers, and her captains should have made a requisition for them, although there is no statutory requirement; but, as the owners depended upon the captain to see that the equipment of the vessel for the voyage was complete in every particular, they are exempt from personal liability for his neglect in this regard. * * * Having employed men of experience and skill in such work to overhaul the vessel, make what repairs were found to be needed, and supply and equip her for the voyage and stow the cargo, and there being no evidence of neglect or mistake in these

particulars on the part of the owners or their employés, I must find that they did exercise due diligence to make the vessel seaworthy, and properly manned, equipped, and supplied."

In The Erie Lighter 108 (D. C.) 250 Fed. 490, it was held:

"It is, also entirely well settled that an owner, and, in the case of a corporation, the managing officer or officers (in this case the superintendent of the marine department), may employ others to perform the duties ordinarily imposed by law upon the owner, such as equipment, examination, repairs, etc., and if due diligence is exercised in selecting persons competent for such work, losses or damages done or occasioned through their fault, without actual complicity or knowledge on the part of the owner, are done or occasioned without the 'privity or knowledge' of the owner, within the meaning of the Limited Liability Acts. Craig v. Continental Ins. Co., supra; The Annie Faxon (D. C. Wash.) 66 Fed. 575, affirmed 75 Fed. 312 * * * (C. C. A. 9th Cir.); The Colima, supra; The Jane Gray (D. C. Wash.) 99 Fed. 582; Van Eyken v. Erie R. R. Co. * * * 117 Fed. 712; McGill v. Michigan S. S. Co., 144 Fed. 788, * * * Oregon Lumber Co. v. Portland & Asiatic S. S. Co., supra [162 Fed. 912]; Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co., supra; Quinlan v. Pew, supra; The Tommy, 151 Fed. 570."

[6] The privity or knowledge within the statute must be that of the managing officers of the corporation, Hill Mfg. Co. v. Providence & N. Y. S. Co., 113 Mass. 495, 18 Am. Rep. 527; Craig v. Continental Ins. Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; and when brought home to the principal officers of the corporation it is chargeable, The Colima, supra. In The Erie Lighter, supra, the court said:

"Whether the petitioner is entitled to a limitation of liability, of course, depends upon whether the damages which the claimant seeks to recover were done or occasioned without the petitioner's 'privity or knowledge,' within the meaning of the Limited Liability Act. As the petitioner is a corporation, its 'privity or knowledge' must be that of its managing officers [citing Craig v. Continental Ins. Co.]. While ordinary agents and servants, including a master of a vessel, are not within that category, a 'managing officer' is not necessarily one of the head executive officers, but is any one to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business [citing cases]. The petitioner, long before the accident in question, had committed the general management and superintendence, including maintenance and repair of its vessels, to a superintendent of its marine department. The latter was therefore clearly a managing officer of the corporation within the before mentioned rule, and his 'privity or knowledge,' if any, is chargeable to the petitioner."

And in that case, petitioner being a railroad corporation operating a fleet of tugs and barges in connection with its railway business, the court held that privity or knowledge within the meaning of the statute, to deprive the petitioner of the right to limit liability—privity or knowledge of acts of commission or omission contributing to the damage—would have to be established in the management of the petitioner's marine department, and in Re Eastern Dredging Co. (D. C.) 159 Fed. 541, it was held that the marine superintendent in charge of dredgers acting under a general manager was an employee, as distinguished from a managing officer, and in order to hold the company it was necessary to show that the general manager was chargeable with the privity or knowledge. In La Bourgogne, supra:

"The loss might have happened by the negligence of the owner of the vessel. Such loss might yet not have been occasioned with a knowledge or privity of such owner."

These expressions were directed to a consideration of section 4283, supra, without regard to any other acts of Congress.

It is established by the testimony that the Canadian Pacific Railway Company is a corporation of the Dominion of Canada, and on the dates in issue was the sole owner of the steamship Princess Sophia, and operated the same between the port of Vancouver, British Columbia, and the port of Skagway, Alaska, via way ports, in what is known as the British Columbia coast steamship service of the Canadian Pacific Railway. In 1900 the Canadian Pacific Railway Company purchased from the Canadian Pacific Navigation Company a fleet of boats in British Columbia and Alaska coast service, whose main office was located at Victoria, B. C. Captain J. W. Troupe prior to this time was in the employ of the railway company as superintendent of its rail lines in the Nelson, B. C., district, and also as manager of a fleet of boats owned by the railway operated on the Kootenay, Arrow, and Slocan Lakes, connecting with transcontinental railroads then under construction. Troupe has been continuously in the steamship business since 1871, as purser, master, and manager. Upon the purchase of the Canadian Pacific Navigation fleet by the petitioner, Troupe was moved to Victoria and placed in charge of this fleet as general manager, and has since been so employed. The fleet at that time consisted of 11 vessels, of about 8,500 tons, and approximately 300 officers and men. At the time of the disaster it consisted of 26 steamers and 6 barges, with 34,817 tonnage, and total number of officers and men employed approximately 750 seamen of all classes, in addition to some 60 certificated deck officers.

In 1911 Troupe appointed Captain Neroutsos as marine superintendent, with the duty of details of operation of the fleet; Troupe looking after the building, purchase and sale of vessels, and general policy of the company, all matters having relation to freight and passenger traffic, major alterations and repairs of the fleet, and generally speaking all matters outside of the mere operating details. Neroutsos reported direct to Captain Troupe in connection with all matters connected with detailed operation. Neroutsos had been in the employ of the British Columbia coast steamship service as deck officer and master 10 years prior to his appointment, and acted as marine superintendent for 7 years, and had been engaged as seaman, officer, and master since 1882, and had had previous experience as port superintendent of Frank Waterhouse & Co. of Seattle, and assistant to Lloyd's surveyor at Tacoma and Portland. Captain Locke, master of the lost ship, was a mate in the employ of the Canadian Pacific Navigation Company, and was continuously in the employ of the Canadian Pacific Railway from 1900 to 1918, the time of his death, and was familiar with Alaskan waters. From the record before the court there is no question as to Captain Locke's efficiency, and there is nothing to indicate that he was incompetent by reason of intoxicants or otherwise on this voyage. In 1909 Captain Troupe issued a book of rules and regulations for the government of the vessels of the company, in harmony with the International Rules of Navigation. These were in force at the time of the disaster. From time to time until the casualty, by circulars, the at-

tention of the officers of the vessels was challenged to these and they were cautioned to obey the rules and to take *no chances.*

It is strenuously urged that Lowle, at Juneau, was the petitioner's managing agent in Alaska. The most that can be said is that he was the freight and passenger agent in Alaska, but had nothing to do with the navigation or operation of vessels. It is also contended that Captain Troupe directed, or that some one in authority did direct, the holding of the passengers on the Sophia on board until the arrival of the Alice from Vancouver. This contention fails. There is nothing in the record to sustain it. Messages could only be sent to and from the wreck by wireless. No messages between the Sophia and Vancouver, or elsewhere, could be exchanged, unless sent over the United States cable office at Juneau, and only then by wireless or by cable. The entire records of the cable office and the wireless stations are in evidence. The master of the ship, so far as the petitioner is concerned, was left to the free exercise of his own judgment in the emergency, and for his error of judgment the petitioners may not be held. The master of the ship in disasters must be left to the free exercise of his own judgment.

Much is said in the brief of claimants with relation to the insufficiency of the crew, and in the particular that only two quartermasters were upon the vessel, and that they would become exhausted by standing watches; but this contention is not supported by the evidence, which shows that they did not stand watches for 24 hours, but that they were relieved by petty officers, and it is conceded that the casualty took place within 4 or 5 hours after leaving the port of Skagway, and there is no testimony which would indicate that the calamity was caused by reason of such contention. There is testimony that some of the deck hands were boys from 16 to 19 years of age, and that the vessel was therefore not properly manned, measured by the laws of the United States. In The Jane Gray, supra, it was said:

"As the owners depended upon the captain to see that the equipment of the vessel for the voyage was complete in every particular, they are exempt from personal liability for his neglect in this regard. * * *"

This was in effect indorsed by the Circuit Court of Appeals in Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co., 197 Fed. 703, 117 C. C. A. 97. In The Norge (D. C.) 156 Fed. 845, the court said:

"Her officers and crew were well qualified. She had a small number of boys on board, but they were competent to perform their duties, and no real criticism can be made against the steamer in such respect."

In the instant case there is no testimony of the inefficiency of these boys. They all had some experience as seamen. They were not able seamen within the provisions of the La Follette Act (38 Stat. 1164), but were men of some experience. It is also strongly urged that the master and officers of the vessel were incompetent, and that the crew, by reason of the boys employed, were not within the requirements. This contention is not sustained. The officers were clearly competent, and as to the boys employed the owners had a right to rely on the master and officers, whose duty it was to see to the proper equipment

and manning of the ships in the regard mentioned, and it should be said in this connection that there is nothing in the case to indicate that the boys were not competent, and since the disaster was not one of sudden emergency requiring immediate action, the vessel remaining on the reef for 40 hours, nearly 2 days, and there being on the vessel as passengers some 85 experienced seamen and boatmen, employees of the American & Yukon Navigation Company, returning from the 1918 season's work.

Among these were 4 masters, 1 mate, and 22 deckhands; the others being engineers and stewards. All these men, it appears, had much experience in handling boats on the Yukon. While this fact does not take from the duty of the owners to discharge its duty in properly manning the vessel it may be considered only as to whether the incompetency of the boys can have contributed to the disaster, since there was ample time to select boat crews from the experienced seamen among these men and the crew to remove the passengers by the use of the steamship's boats, if it had been deemed feasible or practicable under the conditions of the weather by the master; the lives of these men also depending on the event.

It is also urged that, because of influenza epidemic upon the vessel, many of the crew were disabled on the voyage from Vancouver to Skagway, and were not in physical condition to perform their duty as seamen. This largely is conjecture. There is some testimony that some members of the crew at Skagway were indisposed. The extent is not shown, nor the disease from which they were suffering, if any. It also appears that there were added to the crew at Skagway some 8 or 10 seamen from the Yukon river.

[7] As to the general equipment of the ship for the voyage, the evidence shows that the vessel was thoroughly inspected by Cullum, steamboat inspector of the Dominion of Canada, for her annual inspection from the 23d to the 26th days of March, 1918 and he issued an annual certificate dated March 26, 1918. On October 19, 1918, a permit was issued to the steamship, authorizing her to carry a total of 350 passengers, exclusive of her crew, upon placing on board four additional buoyancy appliances of the capacity of 26 persons each. These additional buoyancies were approved prior to the 19th of October. All of the life-saving equipment on board the steamship was inspected at this time by the steamboat inspector at Vancouver, and the following official entry was recorded:

"To Whom It May Concern: I hereby certify that additional life-saving equipment sufficient for 100 persons has been placed on board the steamer Princess Sophia, of Victoria, B. C., official No. 130620, and said steamer Princess Sophia may therefore be permitted to carry 100 persons in addition to the number stated on her regular passenger certificate, making a total of 350 passengers allowed to be carried, from the 19th of October to the 31st of October, 1918."

The United States inspector for the district of Seattle testified, under the reciprocal provisions of Rev. Stat. § 4400 (Comp. St. § 8152), American inspectors, in issuing certificate to a foreign vessel, check up the equipment on board the foreign vessel as specified in their foreign certificate. He further identified circular instruction from the

278 F.—13

Secretary of Commerce, specifying the Dominion of Canada as one of the foreign countries whose inspection laws approximate that of the United States. The certificate issued to the Sophia was in effect at the time of her loss. In addition to the Canadian steamship inspector's testimony, Captain Harrison testified that when he took charge as first officer of the Princess Sophia on October 1, 1918, he held fire and boat drill and inspected all the ship's boat tackle, gear, appliances, blocks, and equipment, and found them to be in first-class condition, and sent a written report to the marine superintendent. The compass was inspected and found to be in good adjustment up to October 8, 1918. There is no testimony to the contrary. Testimony also shows the barometer was in good condition. From the evidence presented it would appear that the steamship was properly manned and equipped and seaworthy for the voyage in conformity to the Canadian laws, and found by the United States inspectors to come within the requirements of section 4400 of the Revised Statutes.

Claimants contend that, although the steamship was a Canadian vessel, the inspection laws of the United States apply, and her efficiency in point of equipment, life-saving appliances, and crew is to be measured by the law of the United States and rules appertaining to American vessels, and that the inspection which was made by the United States inspectors was not an inspection based upon the requirements, but rather credited to the Canadian inspection. I think the record discloses that prior to 1905 it was officially determined that the inspection laws of the Dominion of Canada approximated those of the United States, and that Canadian vessels were examined pursuant to the requirements of title 52, Rev. Stat. Under the conditions named in the proviso of section 4400, Rev. Stat., the Board of Inspectors pursuant to the provisions of section 4405, Rev. Stat. (Comp. St. § 8159), promulgated rules and regulations to carry forward the provisions of section 4400. These rules so promulgated have the force of law. La Bourgogne, supra. It is conceded, I think, that the vessel complied with the Canadian law. The provisions for equipment are contained in sections 4399 to 4462, Rev. Stat. (Comp. St. § 8151 et seq.), and for transportation of passengers and merchandise, including the manning of vessels, safety appliances, etc., are contained in sections 4463 to 4500, being title 52, Rev. Stat. (Comp. St. § 8225 et seq.). Section 4400, brought forward from section forty-one of the Act of February 28, 1871, provides:

"All steam vessels navigating waters of the United States which are common highways of commerce, are open to general or competitive navigation, excepting public vessels of United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of this title."

This section was amended August 7, 1882 (22 Stat. 346), by subjecting all foreign vessels carrying passengers from any part of the United States to any other places or country to the provisions of sections 4417 Rev. Stat. (8172, Comp. Stat.), 4418, Rev. Stat. (8173, Comp. Stat.), 4421, Rev. Stat. (8182, Comp. Stat.), 4422, Rev. Stat. (8183, Comp. Stat.), 4423, Rev. Stat. (8184, Comp. Stat.), 4471, Rev. Stat. (8241, Comp. Stat.), 4472, Rev. Stat. (8242, Comp. Stat.), 4473, Rev.

Stat. (8243, Comp. Stat.), 4479, Rev. Stat. (8249, Comp. Stat.), 4482, Rev. Stat. (8252, Comp. Stat.), 4488, Rev. Stat. (8258, Comp. Stat.), 4489, Rev. Stat. (8259, Comp. Stat. 1913), 4496, Rev. Stat. (8272, Comp. Stat.), 4497, Rev. Stat. (8273, Comp. Stat.), 4499, Rev. Stat. (8275, Comp. Stat.), and 4500, Rev. Stat. (8276, Comp. Stat.).

This section was further amended March 1, 1895 (28 Stat. 699). This amendment is immaterial to this issue. Further amendment was made February 15, 1902 (32 Stat. 34), as follows:

"Provided, however, that when such foreign passenger steamers belong to countries having inspection laws approximating those of United States, and have unexpired certificates of inspection issued by the proper authorities in the respective countries to which they belong, they shall be subject to no other inspections than necessary to satisfy the local inspectors that the condition of the vessel, her boilers, and life saving equipment are as stated in the current certificate of inspection."

The Sophia at the time of the disaster was equipped and manned as required by Canadian law. She had unexpired certificates from the Canadian authorities (section 4400) and also had been inspected by the local United States authorities in harmony with the proviso and had proper certificate. It must be clear under the proviso that the proper certificates of the proper authorities of such foreign countries is conclusive proof that the vessel is properly equipped as required by such foreign laws, and the local inspectors shall subject such vessel to no other inspection than necessary to satisfy such local inspectors that the condition of the vessel, etc., is as stated in the current certificate of inspection.

[8] It is further contended that the La Follette or Seamen's Act of March 4, 1915, in any event applies. This act is entitled:

"An act to promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." 38 Stat. 1164.

Section 1 of this act amends section 4516, R. S. (section 8306, Comp. Stat.). Section 2 (Comp. St. § 8363b) regulates hours of service in the merchant marine of the United States. Section 3 amends section 4529, R. S. (section 8320, Comp. Stat.). Section 4 amends section 4530, R. S. (section 8322, Comp. Stat.). Section 5 amends section 4559, R. S. (section 8348, Comp. Stat.). Section 6 amends Act March 3, 1897 (29 Stat. c. 389), relating to fees. Section 7 amends section 4596, R. S. (section 8380, Comp. Stat.). Section 8 amends section 4600, R. S. (section 8382, Comp. Stat.). Section 9 amends section 4611, R. S. (section 8391, Comp. Stat.). Section 10 amends section 23 of "An act to amend the laws relating to American seamen of December 21, 1898," relating to provisions (Comp. St. § 8392a). Section 11 amends Act June 26, 1884, relating to advances and allotments to seamen (E):

"And provided further that this section shall apply to seamen on foreign vessels while in the harbors of the United States. * * * *"

Section 12 repeals section 4536, R. S. (section 8325a, Comp. St.). Section 13 (Comp. St. § 8363a) has relation to qualification of seamen, and provides that:

"No vessel of 100 tons gross and upward, except those navigating rivers exclusively and the smaller inland lakes and except as provided in section one of this act, shall be permitted to depart from any port of the United States unless she has on board a crew not less than seventy-five per centum. * * *"

Section 14 amends section 4488, R. S. (section 8258, C. S.), and contains this clause:

"Provided, that foreign vessels leaving ports of the United States shall comply with the rules herein prescribed as to life saving appliances, their equipment, and the manning of same."

Section 15 relates to reports of accidents to barges while in tow through the open sea. Sections 16 and 17 (Comp. St. §§ 8382a, 8382b) abolish arrest, etc., for desertion and imprisonment for desertion on American and foreign vessels while in port. Section 18 (Comp. St. § 8382c) provides that the act shall take effect as to American vessels within 8 months and as to foreign vessels within 12 months. Section 19 amends section 4581, R. S. (section 8372, C. S.), and modifies the fellow servant rules as to personal injuries on board.

Claimants contend that sections 13 and 14 apply to foreign vessels. That the Congress has power to legislate with relation to foreign vessels in the waters of the United States is determined in Strathearn v. Dillon, 252 U. S. 348, 40 Sup. Ct. 350, 64 L. Ed. 607; Sandberg v. McDonald, 248 U. S. 185, 39 Sup. Ct. 84, 63 L. Ed. 200; Neilson v. Rhine Co., 248 U. S. 205, 39 Sup. Ct. 89, 63 L. Ed. 208.

The issue raised by the two sections referred to is to an extent of first impression. I think it may safely be said that by the amendment of a section applicable to United States vessels only, unless by express terms the amendment is extended to foreign vessels, the scope will not be broadened. Section 13 is not an amendment, but an independent expression, and must be construed in consonance with the general purpose and intendment of the act, which by its title is to promote the welfare of *American seamen* in the merchant marine of the *United States,* and contains no expression extending the provisions to foreign vessels. It is limited to American seamen on United States vessels, some provisions of the act being expressly extended to foreign vessels, and, being withheld from section 13, the intent of the Congress is clear the rule of construction, "expressio unius est exclusio alterius." U. S. v. Barnes, 222 U. S. 513, 32 Sup. Ct. 117, 56 L. Ed. 291. The expression *"no vessel of 100 tons or more"* is broad and comprehensive, and must be held to have relation only to the subject legislated upon, and be limited to the general context as expressed in the title of the act.

[9] Section 14 is more difficult of solution. This section has been very fully and ably discussed by Attorney General Gregory in an opinion rendered on request of the President. 30 Opinions of Attorney General, p. 441. At page 442 he says:

"This section 14 of the seamen's bill is an additive amendment to section 4488 of the Revised Statutes, which itself had been previously amended in respects not material here by the Acts of March 2, 1889 (25 Stat. 1012), April 11, 1892 (27 Stat. 16), and March 3, 1905 (33 Stat. 1024). Section 4488 was originally enacted as section 52 of the Act of February 28, 1871, entitled 'An act to provide for the better security of life on board of vessels propelled in whole or in part by steam,' etc. (16 Stat. 440). Section 41 of the last named

act, which became section 4400 of the Revised Statutes, defined the vessels 'subject to the operation of the act, and, of course, to the operation of its section 52, now section 4488 Revised Statutes. This section 41, was amended by the Acts of August 7, 1882 (22 Stat. 346), March 1, 1895 (28 Stat. 699), February 15, 1902 (32 Stat. 34), and March 17, 1906 (34 Stat. 68), the last amendment being a complete redraft. Since section 14 is expressly an amendment of pre-existing law, which is to be found in these sections 4400 and 4488 of the Revised Statutes. * * *"

Continuing on page 448 says:

"I conclude, therefore, that the words 'foreign vessels' in the proviso under discussion can only be read as 'foreign vessels subject to the operation of section 4488, of which this proviso is amendatory.' This reading meets the declared purpose of the conference committee, accords with the principles of construction applicable to such an amendatory proviso, and makes the amendment harmonize with the large underlying purpose (security of life) of the section on which it was imposed, and also of the act to which that section belongs."

This construction of the Attorney General will be adopted.

[10] It is further contended that as to the seamen the liability may not be limited under the "Jones Act." Section 20 of the La Follette Act, supra (Comp. St. § 8337a) provided that in an action to recover damages for an injury sustained on board of the vessel, the fellow servant rule shall not apply. June 5, 1920, this section was amended by section 33 of the Jones Act (41 Stat. 988), as follows:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply: and in cases of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. * * *"

This statute creates a substantive right—adds to one and takes from another—changes the relation of the parties at the time of the casualty. It introduces a new policy and changes the existing statutes. The accident occurred 20 months prior to the passage of this act, and it may not be given retroactive effect. Judge Gilbert, in Winfree v. N. P. Ry. Co., 173 Fed. 65, 97 C. C. A. 392, 44 L. R. A. (N. S.) 841, in denying retroactive effect of the Employers' Liability Act (35 Stat. 65 [Comp. St. §§ 8657–8665]) at page 66 said:

"It is not presumed that Congress intended to impose civil liability upon carriers founded upon transactions which at the time of their occurrence gave no rise to a legal demand against them."

The authorities cited by the claimant (Campbell v. Holt, 115 U. S. 620, 6 Sup. Ct. 209, 29 L. Ed. 483; Cooley, Constitutional Limitations, pp. 529, 543) are fully answered by Judge Gilbert saying retroactive effect is given only to such laws as were "intended to remedy a mischief, to promote public justice, to correct innocent mistakes, to cure irregularities in judicial proceedings, or to give effect to the acts and contracts of individuals according to the intent thereof." This deci-

sion was affirmed by the Supreme Court. 227 U. S. 296, 33 Sup. Ct. 273, 57 L. Ed. 518.

[11] It is finally urged that section 4493 must be construed with section 4283, and, as so construed, the liability as against the claims of passengers or their dependents for both personal injuries or baggage may not be limited. This is a more difficult question to determine, it being contended by the petitioner that, while these sections may be construed pari materia, it has no application to foreign ships. Judge Gilbert, in The Annie Faxon, supra, said:

"* * * Sections 4283 and 4493 stand together in the Revised Statutes, and provide for two distinct classes of liability—the one prescribing the general rule that, for damage through negligent acts done without the privity or knowledge of the owner, liability should not exceed the amount or value of the interest of such owner in the vessel and her freight then pending; the other providing that for injury occurring through the neglect or failure of the owner to comply with the provisions of title 52 of the Revised Statutes for the regulation of steam vessels * * * liability to the full amount of the damage. They are statutes in pari materia—the one creating a general rule of limitation of liability, the other making exceptions in favor of passengers. Section 4493, as appears by its title as well as by its provisions, was intended to provide for better security of life on board steam vessels. In Sherlock v. Alling, 93 U. S. 99, a broad construction was given to that section; and it was held that under its provisions the master, the owner, and the vessel are liable for damages sustained by a passenger, arising through neglect to comply with the provisions expressed in title 52, no matter where the fault might lie. * * *"

The Circuit Court of Appeals of the Sixth Circuit, in Great Lakes Towing Co. v. Mill Transp. Co., 155 Fed. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769, in considering Act March 3, 1851 (section 4283, R. S.; section 8021, C. S.), and section 18, Act June 26, 1884 (section 8028, C. S.), held that these sections should be held as parts of one entire scheme, and that section 18 was intended as an extension merely of the relief provided by the act of 1851 (section 4283 R. S.; section 8021 C. S.), and that the act of 1851 (section 4283, R. S.; section 8021, C. S.) was regarded as the basic law, to which section 18 of the act of 1884 (section 8028, C. S.) was intended to be a supplement. This view also obtains in Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110, and a like view in Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 Sup. Ct. 292, 63 L. Ed. 631. Section 4493, R. S. (section 8269, C. S.), was enacted February 28, 1871, and provides:

"Whenever damage is sustained by any passenger or his baggage, from * * * or other cause, the master and the owner of such vessel * * * shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect, or failure to comply with the provisions of this title. * * *"

The same reasons given in Great Lakes Towing Co. Case, supra, indorsed by the Supreme Court in Richardson v. Harmon, supra, apply here, and upon such authority section 4493 must be held to be intended as supplementary to section 4283, R. S. (section 8021, C. S.), the basic law, and from such conclusion, if the owner is guilty of negligence which was the proximate cause of the loss of the lives of passengers, the liability for such death and baggage may not be limited, whether or not the owner was privy to or had knowledge of such acts.

The contention that the provisions of this section do not apply to foreign vessels cannot be sustained. It is a part of the entire scheme with relation to the merchant marine, and supplemental to section 4283, R. S. (section 8021, C. S.), and a part of the basic law which the Supreme Court says extends to foreign ships, Titanic v. Mellor, supra; and the petitioner, claiming the benefits under this section, must be held to the limitations placed upon it, and thus stand at the bar of the court on a parity with domestic owners. Considered in the light of reason and in connection with the scheme as a whole, having in mind the remedies or safeguards sought and the expression of the Circuit Courts of Appeals in the several circuits and of the Supreme Court, the conclusion as stated in The Virginia (D. C.) 264 Fed. 986, is inevitable.

Petitioner intimates that the conclusion in that case was inspired by the fact that the owner had privity or knowledge, but this is dispelled by the court when it says:

"I have concluded that the negligence of the petitioners does not amount to privity or knowledge, within the meaning of those words as used in section 4283."

We next come to a consideration as to the negligence of the petitioner. The testimony agrees that the Sophia left Skagway at 10 o'clock p m., and that she struck Vanderbilt reef at 2 o'clock a. m. The distance is conceded, I think, approximately 56 knots. The normal speed of the Sophia is shown by the testimony to be approximately 12 knots per hour. It is established, if not conceded, that during a portion of this time a blinding snowstorm was raging in Lynn Canal and in the vicinity of the catastrophe. Many witnesses testified as to the severity of this snowstorm, and there is no doubt in my mind that a severe snowstorm was pending and that the Sophia foundered while in the fog and storm. From the admitted or established facts, it is shown that the vessel moved 56 knots in approximately 4 or 5 hours, an average speed of 14 knots if made in 4 hours, and over 11 knots if made in 5 hours. Bearing in mind the relation of the route of the ship to the light off Point Sherman, and the light on Sentinal Island, and the location of Vanderbilt Reef, and the fog and snow that is reasonably shown to have prevailed in this vicinity, and the stage of the tide and the relation of Vanderbilt reef to the tide, the character and extent of the wound received by the Sophia, "a clear rip the full length, 72 feet"— "no solid place in the length"—the rip being approximately 2 feet wide, the vessel not having much cargo beside the passengers, the conclusion is unavoidable that a proper lookout was not maintained, and that the vessel was going at an excessive speed, and either one or both of these acts of commission and omission was the proximate cause of the foundering of the ship and the death of the passengers. Article 16 of International Rules (section 7854, C. S.) provides:

"Every vessel shall in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions. * * *"

The Supreme Court, in Chamberlain v. Ward, 21 How. 548, at page 571, 16 L. Ed. 211, said:

"Ocean steamers usually have two lookouts in addition to the officer of the deck, and in general they are stationed one on the larboard and the other on the starboard side of the vessel, as far forward as possible, and during the time they are so engaged they have no other duties to perform; and no reason is perceived why any less precaution should be taken by first-class steamers on the Lakes. Their speed is quite as great, and the navigation is no less exposed to the dangers arising from the prevalence of mist and fog, or from the ordinary darkness of the night; and the owners of vessels navigating on those waters are under the same obligations to provide for the safety and security of life and property as attaches to those who are engaged in navigating the seas."

This was restated and approved by the Supreme Court in The Colorado, 91 U. S. 692, 23 L. Ed. 379. The statement has application to the Alaskan waters, including Lynn Canal. There is no testimony before the court to show that a proper lookout was not maintained, as all on board perished. There is testimony that the lookout who had signed for shipment and who had acted in that capacity on previous voyages failed to report when the vessel was ready to sail and did not ship. This fact of itself indicates nothing. The only testimony as to what transpired must be deduced from the circumstances. Moderate speed may be given as such rate of speed, in view of the particular circumstances, as will enable the steamer to seasonably and effectively avoid collision with a vessel or charted obstruction by slackening or stopping and reversing within the distance at which such vessel or charted object may be seen. The Batavier, 40 Eng. L. & Eq. 25; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The City of New York (C. C.) 35 Fed. 604, affirmed 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84. In The Nacoochee the court held a speed not moderate which was not slow enough to enable the ship to avoid a vessel sighted in her track at a distance of from twice to three times her length. Vanderbilt reef was charted, its location was known to the navigating officers, and it was also known that it was dangerous. The Supreme Court, in The Nacoochee, supra, referring to The Batavier, supra, said:

"The rule laid down in the last-named case is that, at whatever rate a steamer was going, if she was going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate"

—and referred to The Pennsylvania, infra. If such care is exacted for the protection of "any craft," equal care must be exacted for the life of passengers on a vessel, if the rate of speed would endanger the vessel to collision with a charted object which might have been seen or ought to have been seen. Even though charted objects are not named in the statutes, the principle enunciated is applicable. The Oceania Vance (D. C.) 217 Fed. 973, affirmed 233 Fed. 77, 147 C. C. A. 147; The Rhode Island (D. C.) 17 Fed. 554. In this case the object was stationary and fixed, while the position of a moving craft is shifting. There is less excuse for colliding with a fixed, charted object than with a moving vessel. Ordinary care on the part of the lookout and moderate speed would have prevented the catastrophe. Navigating through a storm of the character disclosed by the testimony, at a speed which would carry the vessel upon the reef 72 feet, inflicting the injury dis-

closed under the circumstances shown in the testimony, is contrary to the International Rules of Navigation (section 7854, C. S.; Act Cong. Aug. 19, 1890), and a violation of the rule of ordinary prudence in navigation, and establishes a presumption of negligence, which, unless overcome, is conclusive.

"The burden rests" on a ship to show, whenever she disregards the statutory regulations, not merely that such disregard "might not have been one of the causes of the collision," or even "that it probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148.

The intent and purposes of the Congress in safeguarding life is manifest by section 4493, R. S. (section 8269, C. S.), supplementing section 4283, and finds expression in the Jones Act, supra, having reference to the protection of seamen (which, however, has no relation to this issue), and gives emphasis to the care for human life. Stokes v. Saltonstall, 13 Pet. 181, 10 L. Ed. 115; Liverpool Steam Co. v. Phœnix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; The Oregon, 133 Fed. 618, 68 C. C. A. 603; Phila. & Reading Ry. Co. v. Derby, 14 How. 468, 14 L. Ed. 502.

There is much conjecture and speculation injected into the case by the claimants. Substantially all testimony offered was admitted into the record. I think what has been said disposes of all the material contentions raised, whether they have been specifically referred to or not, and where not specifically referred to are deemed immaterial to this issue, or not sustained, and it follows that the liability of the petitioner may be limited as to the cargo of claimants, but not as to the claims of passengers or their dependents or their baggage.

## On Rehearing.

[12] On the ground that the court erred in its application of section 4493, R. S., to the facts in issue, and in concluding that liability could not be limited to the claims of passengers or their dependents, or their baggage, petition for rehearing was filed, a rehearing granted, and the cause assigned for reargument. The issue has been fully briefed and ably argued at bar. On the former hearing this issue was not fully briefed nor much discussed at bar.

Article 16 of the International Rules (26 Stat. 326, section 7854, C. S.) was enacted August 19, 1890, and it is contended by claimants is an enactment by the Congress on the same subject as section 42 (Comp. St. § 8257), and parts of section 43, relating to pilots on coastwise vessels, etc., of the Act of Feb. 28, 1871, and section 4477, R. S., 16 Stat. 453 (Comp. St. § 8247), and that, considered in relation with 4493, brought forward from section 43, supra, denying limitation of liability as to passengers, their dependents and baggage on the contingency stated, the meaning of the Congress is clear that violation of article 16, supra, and its relation to section 4493, supra, should be considered as a part of the entire scheme with relation to the merchant marine, and supplemental to 4283, R. S.; that all acts passed by prior and subsequent Congresses have relation and should be considered, and cites State v. Omaha El. Co., 75 Neb. 637, and 106 N. W. 979 at 983, 110 N. W. 874, where the court says:

"We think it clear that the whole series of statutes directed against combinations and monopolies should be considered as parts of a connected system, and that no one act should be singled out for expression and be considered apart from the general trend of legislation upon the subject. Statutes in pari materia are to be construed together, and repeals by implication are not favored. The courts will regard all statutes upon the same general subject matter as part of one system, and later statutes should be construed as supplementary or complementary to those preceding them. They are to fill up the gaps left by former attempts to amend the evil."

And counsel also quotes Mr. Justice Swayne in Jones v. Guaranty & Ind. Co., 101 U. S. 626, 25 L. Ed. 1030, as follows:

"A thing may be within a statute but not within its letter, or within the letter and yet not within the statute."

[13] It is further contended that section 4477, R. S., of title 52, provides:

"Every steamer carrying passengers during the nighttime shall keep a suitable number of watchmen in the cabins, and on each deck, to guard against fire or other dangers, and to give alarm in case of accident or disaster"

—and that, irrespective of article 16, supra, the limitation as to passengers and dependents and baggage must be denied, since watchmen were not kept on each deck as lookout, as provided by this section, which is within title 52, and therefore within the exception in section 4493, supra. It is also urged that by "labored" construction the Supreme Court did "add to the statute in face of the provisions contained in section 4 of the act of 1851"—the original act on limitation of liability —and cites Butler v. Boston & Savannah S. S. Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017. Without further comment I will simply say that the rule announced in the Butler Case is stare decisis.

The conclusion of the court heretofore stating that "ordinary care on the part of the lookout and moderate speed would have prevented the catastrophe" is not a finding of "neglect to keep the watchman," as provided in section 4478, R. S. (Comp. St. § 8248), fixing the penalty for violation of provisions of section 4477, supra. Neglect on the part of the watchman, or lookout, is not a finding of "neglect to keep a watchman."

[14] *Neglect of the watchman* to perform his duty, with nothing more, is without privity of the owner. The Colima (D. C.) 82 Fed. 680; The Longfellow, 104 Fed. 367, 45 C. C. A. 379; Butler v. Boston S. S. Co., 130 U. S. 549, 9 Sup. Ct. 612, 32 L. Ed. 1017; Craig v. Continental Ins. Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751; La Bourgogne, 210 U. S. 95, 28 Sup. Ct. 664, 52 L. Ed. 973; The Titanic, 233 U. S. 718, 34 Sup. Ct. 754, 58 L. Ed. 1171; Richardson v. Harmon, 222 U. S. 105, 32 Sup. Ct. 27, 56 L. Ed. 110; Coggeshall v. Early, 248 Fed. 1, 160 C. C. A. 141; The Rochester (D. C.) 230 Fed. 520. There is no finding or testimony that there was no watchman.

It is also contended on the rehearing that section 4401, R. S. (Comp. St. § 8153), was violated, in that no licensed pilot was provided, and such fact alone sustains the decision announced. Section 4401 relates to "coastwise seagoing vessels," and not to foreign ships. Coastwise indicates vessels engaged in the domestic trade, or plying between port

and port in the same country, as contradistinguished from those engaged in foreign trade. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; City Council of S. F. v. California Steam & Nav. Co., 10 Cal. 504; U. S. v. Patten, 27 Fed. Cas. 460, No. 16007; Ravesies v. U. S. (D. C.) 35 Fed. 917.

Section 4401, supra, was before the Supreme Court in Butler v. Boston, etc., supra, and (130 U. S. at 554, 9 Sup. Ct. 618, 32 L. Ed. 1017) it was said:

"The main allegation relied on by the appellants [claimants] to bring the case within the steamboat inspection law is that the second mate was in charge of the vessel at the time of the accident, and that he was not a licensed pilot. The libeled owners deny this, and claim that it is immaterial, if true. There is no proof on the subject, but suppose it were admitted to be true, how could the owners have prevented the second mate from being in charge? By virtue of his office and the rules of maritime law, the captain or master has charge of the ship and of the selection and employment of the crew, and it was his duty, and not that of the owners, to see that a competent and duly qualified officer was in actual charge of the steamer when out on the high seas."

The language quoted has application to section 4477. The duty to "keep a suitable number of watchmen" on a passenger steamer at sea is clearly on the master. In the former decision it was inadvertently said:

"If the owner is guilty of negligence which was the proximate cause of the loss of lives of passengers, the liability for such death and baggage cannot be limited, whether or not the owner was privy to or had knowledge of such acts."

The language is too comprehensive. This is what should have been said: Neglect or failure to comply with the provisions of the law having relation to limitation of liability statutes would not bar liability for such death, etc.

The contention that all statutes upon the same general subject-matter are part of one system or scheme with relation to the merchant marine, and should be construed together, was heretofore considered by the court, and it was then stated that "the petitioner claiming the benefit of this section [4483] must be held to the limitations placed upon it, and thus stand at the bar of the court on a parity with domestic owners," and unless inhibited by statute such rule must be followed.

At bar emphasis is placed upon the penalties provided for certain conduct by sections 6 and 57 (section 5344, R. S. [Comp. St. § 10455]) act of 1871, supra, and section 4478, R. S. (Comp. St. § 8248); but these sections can have no controlling effect of themselves as limiting the operation of section 4283. Section 4493 is brought forward from section 43 of the act of 1871, supra, and this section was brought forward from section 30 of the act of 1852 (10 Stat. 72), with this difference: Section 4493 contains this phrase, "failure to comply with the provisions of this title, * * *" whereas section 30 and 43, supra, each read "failure to comply with the provisions of law herein prescribed. * * *"

In the revisory act of June 22, 1874 the laws (Rev. St. 1873) were embraced in 73 titles, and title 52 pertained to "regulation of steam

vessels," chapter I, "inspection," chapter II, "transportation of passengers and merchandise," and by the provision of section 5600 (Comp. St. § 10597):

"The arrangement and classification of the several sections of the revision have been made for the purpose of a more convenient and orderly arrangement of the same, and therefore no inference or presumption of a legislative construction is to be drawn by reason of the title, under which any particular section is placed."

And section 5596, R. S. (Comp. St. § 10593), provides:

"All acts of Congress passed prior to said first day of December one thousand eight hundred seventy-three, any portion of which is embraced in any section of said revision, are hereby repealed, and the section applicable thereto shall be in force in lieu thereof; all parts of such acts not contained in such revision, having been repealed or superseded by subsequent acts, or not being general and permanent in their nature  *  *  *  and all acts of Congress passed prior to said last named day, no part of which are embraced in said revision, shall not be affected or changed by its enactment."

Reference may only be had to the prior acts for the purpose of ascertaining the intent of the Congress.

It is strongly contended by claimants that, since section 3 of the Act of March 3, 1851 (9 Stat. 635), is the original limitation of liability statute carried forward to section 4283, R. S., and that section 41, Act 1871, supra, refers particularly to inland waters of the United States, the provision excluding foreign vessels from the operation of the "provisions of law herein prescribed" (43) had no relation to section 3, Act 1851, supra, and that section 43 (4493) does apply to foreign vessels, since there is no restriction as to the act of 1851; that section 43 was brought forward from section 30 of the Act of August, 1852, and must be considered in pari materia with section 3 of the act of 1851, and reading these sections together it is apparent that section 3, Act 1851, and section 30, Act 1852, had application to the same vessel in the same water, and that not until the Act of June, 1886 (24 Stat. 80), was the Liability Act of 1851 made to apply to foreign vessels. Section 4, Act June 19, 1886, provides:

"That section four thousand two hundred eighty-nine of the Revised Statutes be amended so as to read as follows: Section 4289. 'The provisions of the seven preceding sections, and of section 18 of an act entitled "An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade, and for other purposes," approved June twenty-sixth, one thousand eight hundred eighty-four [23 Stat. 57], relating to the limitations of the liability of the owners of vessels, shall apply to all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.' "

The seven preceding sections include section 4483, R. S. Section 18, referred to, reads:

"That the individual liability of a shipowner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessels and freight pending: Provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action, nor shall the same apply to wages due to persons employed by such shipowners."

And claimants contend that the petitioner, claiming the benefits under this section, must be held to the limitations placed upon it and thus stand at the bar of the court on a parity with domestic owners, and that the issue here upon the named statutes is concluded by the expression given in La Bourgogne, supra, where the court says (210 U. S. at page 116, 28 Sup. Ct. 671, 52 L. Ed. 973):

"The petitioner is here seeking the benefits conferred by a statute of the United States, which it could not enjoy under the general maritime law. Strictly speaking, the application for a limitation of liability is in effect a concession that liability exists, but, because of the absence of privity or knowledge, the benefits of the statute should be awarded. It is true that under the rules promulgated by this court the petitioner is accorded the privilege not only of seeking the benefits of the statute, but also of contesting its liability in any sum whatever. This does not, however, change the essential nature of the proceeding. As the petitioner called the various claimants into a court of admiralty of the United States to test whether, in virtue of the laws of the United States, it should be relieved in part at least of liability from the consequences of the acts of its agents, and, as the international rules have the force of a statute, we think the issues presented were of such a character as to render it essential that the right to exemption should be tested by the law as administered in the courts of the United States, and not otherwise"

—and (210 U. S. on page 140, 28 Sup. Ct. 680, 52 L. Ed. 973) where the court says:

"Moreover, as we have said previously, as the petitioner is here an actor, seeking to avail of the benefits of a statute of the United States, it becomes the duty of the courts of the United States to determine the question of fault by the International Rule as they interpret it. And in the nature of things it cannot be that the vessel which seeks the benefit of the law of the United States can be held to be in fault and not in fault concerning the same act or acts."

And in support they say that the English and Canadian decisions are to the effect that, on application for limitation of liability under such laws, foreign ships are given the same status as British or Canadian ships. Halsbury, in his Laws of England (1914) vol. 26, p. 375; Mayer, Admiralty Law and Practice of Canada (1916) p. 143.

The issue here must be determined by our law as construed and applied by the Supreme Court. The statements of Chief Justice White in La Bourgogne, supra, must be considered in connection with the issue determined, having relation to the limitation placed in section 4400 to the issue here. In 210 U. S. at page 133, 28 Sup. Ct. 677, 52 L. Ed. 973, the Chief Justice stated:

"As originally enacted, the first chapter of title 52 of the Revised Statutes related generally to the subject of inspection of steam vessels. The second section (4400) excluded from the operation of the title 'vessels of other countries,' and therefore all the sections of that chapter, as well as of the following words: ' * * * And all foreign steam vessels carrying passengers from any port of the United States to any other place or country shall be subject to the provisions of' seventeen enumerated sections. [These sections are set out in the original opinion]. When the sections thus enumerated are examined it becomes apparent that they were particularly designated because the amendment of their context was deemed especially appropriate to the fruition of the general purpose of the statute, which was to bring foreign steam vessels under the sway of the requirements of the laws of the United States as to equipment, inspection, etc., hitherto applicable only to domestic vessels."

Section 4400, title 52, was heretofore considered with relation to the approximation of the inspection laws of Canada to those of the United States, and the Canadian vessels to the requirements of title 52, but was not considered in any other relation. The amendment of section 4400 as set out in the opinion included 17 enumerated sections extending the provisions thereof to foreign vessels. Section 4493 is not included. Section 41 of the act of 1871, supra, provides:

"That this act shall not apply to * * * vessels of other countries."

And this provision is carried forward to section 4400, which bears upon the congressional intent; and the status with relation to 4493 is not changed by the amendment of August 7, 1882, supra, and resort may not be had to legislation antedating December 1, 1873, in construing sections of Revised Statutes, unless there is uncertainty or ambiguity. United States v. Bowen, 100 U. S. 508, 18 L. Ed. 675. Here, however, resort is unnecessary, as 4400, supra, contains the provisions of the previous act. Justice Brown, in The Oregon, 158 U. S. 186, at 199, 15 Sup. Ct. 804, 810 (39 L. Ed. 943), says:

"Indeed, the forty-first section of the act [1871] expressly provides that it shall not apply to public vessels of the United States, or to vessels of other countries."

In view of the language employed by the Supreme Court, and granting limitation to foreign owners, it would, upon the express issue here, appear that this court is concluded, and from what is hereinafter stated further inquiry or analysis of this question is unnecessary.

Nor does the amendment of August 7, 1882 (22 Stat. 346), include section 4477, and when section 4400 was further amended March 1, 1895 (28 Stat. 699), exempting vessels of foreign countries having inspection laws approximating those of the United States under certain conditions from the provisions of inspection laws contained in title 52, section 4493 was withheld.

Aticle 16, International Rules, is a part of the general laws for the protection of life at sea, but is not a part of title 52, nor is it a part of title 48. The original enactment of the substance of this section was by Act of April 29, 1864, 13 Stat. 58 (Comp. St. § 7963). Spencer on Maritime Collisions, § 19, p. 37, says:

"In the year 1863 England adopted a system of rules or Orders in Council based upon navigation rules then prevailing upon the high seas. * * * The English rules of 1863 were substantially adopted by Congress in 1864, and were adopted by a large part of the maritime world, and have been with slight alterations in force ever since."

Section 4233, R. S., was brought forward from article 16, Act 1864, supra. This act was amended in 1885 (23 Stat. 438, article 13):

"Every ship, whether a sailing ship or a steamship, shall in a fog, mist, or falling snow go at a moderate speed."

Rule 21 of section 4233 (Comp. St. § 7963) reads:

"Every steam vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam vessel shall, when in a fog, go at a moderate speed."

The enactment of the International Code in August, 1890, replaced all prior legislation on that subject.

At the time of the enactment of the revisionary act of 1874, and also the act of 1871, supra, the substance of article 16 so far as it relates to this issue, existed as a rule of conduct upon the high seas, while a part of the act of 1871 in the arrangement of titles was placed under the head to which it logically belonged, navigation, the liability provided by section 43, supra, is restricted to a violation of the provisions of the act, and primarily the act deals with inspection. From its inception the enjoined duties of article 16 were set forth in the act of 1864, and were not incorporated in the act of 1871, but were carried forward to 4233 under title 48, and by this separate and distinct legislation the intent of the Congress appears plain that the liability imposed by section 43, carried into 4493, did not concern a violation of the enjoined duties under the act of 1864 carried into 4233, R. S., which are replaced by article 16, supra. The Virginia and The Anna Faxon were erroneously applied to this issue. In The Virginia (D. C.) 264 Fed. 986 at page 996, it is said:

"The inspection laws and regulations were not obeyed and this disobedience had its part in causing the deaths, the injuries to the passengers, and the loss of their baggage."

Careful consideration has been given to this issue, and there is no conclusion that I can reach from any view of approach other than that the conclusion granting limitation of liability only to cargo is erroneous. This court is limited by express legislation as construed and applied by the Supreme Court. Legislation is a matter for the Congress, and not a matter of decree by the court.

Liability should be limited to passengers and baggage, as well as cargo.